# UNITED STATES DISTRICT COURT



for the

Eastern District of California

**FILED**

**JUL 26 2017**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| | ) Case No. |
| Gray in color Samsung cellular phone; evidence number 69-18 | ) ) ) |

**2:17 - SW - 6 8 4   CKD**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A-9

located in the _____ **EASTERN** _____ District of _____ **CALIFORNIA** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. section 841(a) | Distribution of a Controlled Substance |
| 21 U.S.C. section 846 | Conspiracy to Distribute a Controlled Substance |
| 21 U.S.C. section 843 | Unlawful Use of a Communication Facility |

The application is based on these facts:

See Affidavit of Special Agent Daniel R. Mercado in Support of Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel Mercado, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____07/25/2017_____

_____
*Judge's signature*

City and state:  Sacramento, California

Hon. Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

# Affidavit of Special Agent Daniel R. Mercado

I, Daniel R. Mercado, being duly sworn, hereby depose and state:

# Purpose

1. This Affidavit is made in support of a search warrants for nine electronic devices seized during the execution of search warrants on January 29, 2014, as described below:

   a. Black LG cellular telephone, evidence item 76-4, seized from 541 Kristin Way, Patterson, California on January 29, 2014, as further described in Attachment A-1.

   b. White iPhone 5 cellular telephone, evidence item 76-5, seized from 541 Kristin Way, Patterson, California on January 29, 2014, as further described in Attachment A-2.

   c. White iPhone 5 cellular telephone, evidence item 76-8, seized from 541 Kristin Way, Patterson, California on January 29, 2014, as further described in Attachment A-3.

   d. Red iPhone 4 cellular telephone, evidence item 76-9, seized from 541 Kristin Way, Patterson, California on January 29, 2014, as further described in Attachment A-4.

   e. White iPhone 4 cellular telephone, evidence item 76-10, seized from 541 Kristin Way, Patterson, California on January 29, 2014, as further described in Attachment A-5.

   f. Black Samsung tablet, evidence item 76-19, seized from 541 Kristin Way, Patterson, California on January 29, 2014, as further described in Attachment A-6.

   g. Black iPhone 5 cellular telephone, evidence item 69-16, seized from 1742 Almond Ave, Patterson, California on January 29, 2014, as further described in Attachment A-7.

   h. Black Blackberry cellular telephone, evidence item 69-14, seized from 1742 Almond Ave, Patterson, California on January 29, 2014, as further described in Attachment A-8.

   i. Gray Samsung cellular telephone, evidence item 69-18, seized from 1742 Almond Ave, Patterson, California on January 29, 2014, as further described in Attachment A-9.

1

## Agent Background

2. I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations ("HSI"). I have been an HSI Special Agent since August 2010. I am currently assigned to the HSI Sacramento District Office. As a HSI agent, I have assisted in the execution of search warrants on many occasions for controlled substances and/or related paraphernalia, indicia, and other evidence of violations of federal drug statutes. I have participated in investigations targeting individuals and organizations trafficking heroin, cocaine, marijuana, methamphetamine, and other controlled substances. I have also become familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their illegal operations.

3. Through my training, experience, and interaction with other experienced special agents, task force agents, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs; to collect and conceal drug related proceeds; and to communicate with other participants to accomplish such objectives. I have received specialized training in narcotics investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques, and drug identification.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. I am a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

## Statement of Probable Cause

### Background

6. Investigators from the California Department of Justice's Mountain and Valley Marijuana Investigation Team ("MAVMIT") began investigating the drug trafficking organization run by Francisco Felix ("Felix DTO") in January 2013. (2:13-SW-0698-WBS.) During the course of this investigation, law enforcement officers utilized the services of two confidential informants, conducted five separate controlled drug purchases, and conducted surveillance of residences, vehicles, and two rural horse ranch properties. On October 30, 2013, the United States submitted an application to the Court for

authorization to intercept wire communications over two cellular telephones.  (2:13-SW-0698-WBS, Application for Authorization to Intercept Wire Communications.)  TT#1 was used by Francisco Felix and TT#2 was used by Alejandro Martinez.

7.  During the course of the wiretap investigation, Felix and Martinez used their cellular telephones to facilitate the distribution of methamphetamine and marijuana.  The Criminal Complaint (2:14-MJ-0016-KJN) is attached and hereby incorporated by reference.

8.  On February 13, 2014, a federal grand jury returned an indictment against Francisco Felix, Alejandro Martinez, and twelve other individuals involved in the Felix DTO.  (2:14-CR-00040-WBS; Doc. 17.)

*Execution of Search and Arrest Warrant related to Francisco Felix*

9.  On January 29, 2014, law enforcement officers executed a federal search warrant at 541 Kristin Way, Tracy, California.  During execution of the search warrant, law enforcement officers encountered and arrested Francisco Felix.  Additionally officers seized the electronic device identified in Attachments A-1 through A-6.

*Execution of Search and Arrest Warrant related to Alejandro Martinez*

10.  On January 29, 2014, law enforcement officers executed a federal search warrant at 1742 Almond Avenue, Patterson, California.  During execution of the search warrant, law enforcement officers encountered and arrested Alejandro Martinez.  Additionally officers seized the electronic device identified in Attachments A-7 through A-9.

11.  Based on the above, I believe there is probable cause to search the electronic devices identified in Attachments A-1 through A-9 for evidence of drug trafficking as outlined in the Criminal Complaint and in Attachment B.

*Conclusion*

12.  Based upon my training and experience, I know that some drug traffickers use cellular telephones and other electronic devices to communicate for a number of purposes related to their criminal activities.  I also know that, some drug traffickers use more than one cellular telephone or frequently change cellular telephones as a method to avoid identification by law enforcement.  I know through my experience with this investigation that members of the Felix DTO used cellular telephones to facilitate drug deliveries to drug customers and to facilitate other drug related matters with associates, such as the collection of drug proceeds.  Accordingly, based upon my training and experience, and Felix DTO members use of cellular telephones in furtherance of drug trafficking

3

activities, I believe that cellular telephones (**Attachment A-1 through A-9**) will contain evidence related to drug trafficking that are specifically identified in Attachment B, which is attached and incorporated herein.

13. Based on my training and experience, when a cellular telephone is turned off, the data on the cellular telephone remains static and does not change. Accordingly, the information contained on the cellular phones identified in Attachments A-1 through A-9 has not changed since the phones were seized and taken into law enforcement custody.

## **AUTHORIZATION REQUEST**

14. Based upon the information set forth above, your affiant submits that there is probable cause to believe that the items and information listed on Attachment B will be located in the items described in Attachments A-1 through A-9, and I request that search warrants be issued for those items, all of which are in the Eastern District of California.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Daniel R. Mercado
HSI Special Agent

Sworn and Subscribed to me on July 25, 2017,

Hon. CAROLYN K. DELANEY
United States Magistrate Judge

Approved as to form:

JUSTIN L. LEE, AUSA

4

# ATTACHMENT A-9

*Items to be Searched*

Gray in color Samsung cellular phone labeled with the following numbers: Model: SGH-T599N UD, FCC ID: A3LSGHT599, and contained within an evidence envelope labeled 69-18. DEVICE 9 is currently located at the Homeland Security Investigations (HSI) Sacramento office, located at 650 Capitol Mall, Suite 3-100, Sacramento, CA 95814 and has been in the continuous custody of law enforcement since January 29, 2014.

This warrant authorizes the forensic examination of the devices for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B
*Items to be Seized*

This search warrant grants authority to seize all of the items set forth below:

1. Any and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with the mobile telephones, including:

    a. Incoming call history;

    b. Outgoing call history;

    c. Missed call history;

    d. Outgoing text messages;

    e. Incoming text messages;

    f. Draft text messages;

    g. Telephone book;

    h. Data screen or file identifying the telephone number associated with the mobile telephone searched;

    i. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

    j. Voicemail;

    k. User-entered messages (such as to-do lists); and

    l. Stored media such as photographs or video.

2. Any passwords used to access the electronic data described above.

3. Any and all locations, addresses, GPS coordinates, names, time/date information, or other electronic data related to addresses and driving directions.

4. All information and records related to drug trafficking, including:

    a. Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators;

    b. lists of customers and related identifying information;

    c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

14

     d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

     e.  any information recording schedule or travel;

     f.  all bank records, checks, credit card bills, account information, and other financial records.

     g.  records of Internet Protocol addresses used;

     h.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

5.  Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

SEALED

AO 91 (Rev. 11/11) Criminal Complaint

**ORIGINAL FILED**

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

JAN 2 8 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| United States of America<br>v.<br><br>FRANCISCO FELIX,<br>a.k.a., "Paco;"<br>ALEJANDRO MARTINEZ,<br>a.k.a "Gallo," a.k.a. "Pelon;"<br>AUGUSTIN RAMIREZ;<br>MIGUEL FELIX,<br>a.k.a. "Mili;"<br>SERGIO MODESTO;<br>ANTONIO RAMIREZ,<br>a.k.a. "Tonio;"<br>GERARDO BARRAZA; and<br>MARTIN LOPEZ | Case No.<br><br>2:14 - MJ - 0016   KJN |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From at least April of 2013, and continuing until at least January 15, 2014, in the County of San Joaquin, State and Eastern District of California, and elsewhere, defendants Francisco Felix, Alejandro Martinez, Augustin Ramirez, Miguel Felix, Sergio Modesto, Antonio Ramirez, Gerardo Barraza, and Martin Lopez, did knowingly and intentionally conspire with each other, and with other persons known and unknown, to distribute and to possess with the intent to distribute at least 50 grams of methamphetamine (actual), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

I further state that I am a Special Agent with Homeland Security Investigations, and this criminal complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

☒ Continued on the attached sheet and made a part of this complaint.

_____
*Complainant's signature*

Philipp Maurer, Special Agent
Homeland Security Investigations

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____January 27, 2014_____

_____
*Judge's signature*

City and state: _____Sacramento, California_____

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

## Affidavit in Support of Criminal Complaint, Arrest Warrants and Search Warrants

I, Philipp Maurer, being duly sworn state the following:

### Background and Experience

1.      I am a Special Agent with the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), currently assigned to the HSI Office in Sacramento, California. I have been employed by ICE as a Special Agent since January 2007. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510 (7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have also been cross-designated by the Drug Enforcement Administration and empowered to investigate and make arrests for offenses under Title 21 of the United States Code.

2.      In my capacity as a Special Agent, I attended and completed the Criminal Investigator Training Program and the U.S. Immigration and Customs Enforcement Special Agent Training at the Federal Law Enforcement Training Center (FLETC), where I received training in conducting immigration, financial, strategic, narcotics, and fraud based investigations, as well as training in asset forfeiture, undercover operations, and physical and electronic surveillance operations. As a Special Agent with HSI, I have also received specialized training on and have conducted cases involving the smuggling of narcotics and sensitive commodities controlled by the United States Government. While conducting these types of investigations, I have written reports of investigation; interviewed suspects; written, served and participated in the execution of dozens of search/arrest and seizure warrants; conducted physical surveillance; arrested violators, and obtained and analyzed telephone tolls, pen register data, public source records, official immigration documents, financial records, notes, ledgers, and pay/owe sheets ("trick books" and "tally sheets").

3.      Over the course of my career, I have participated in and/or planned over 100 operations that included physical and electronic surveillance. I have also interviewed confidential sources (CS), confidential witnesses (CW), confidential reliable informants (CRI), and defendants regarding various criminal activities, including narcotics trafficking. I have testified in grand jury proceedings. I have arrested dozens of people involved in the illegal distribution of narcotics. I have also written reports and analyzed records and documents in conjunction with the preparation of affidavits requesting authorization for the execution of search and arrest warrants and I have authored, planned and executed dozens of said warrants. I have gained knowledge in the use of various investigative techniques, including the utilization of physical surveillance, undercover agents, confidential sources, confidential witnesses, controlled purchases of illegal narcotics, electronic surveillance, consensual monitored recordings, investigative interviews, trash and mail covers, financial investigations, the service of grand jury subpoenas, and the execution of federal search and arrest warrants. I have been the affiant of a Federal Title III Court Ordered Wiretap and as such, was the Federal case agent of the underlying investigation which resulted in arrests of violators and the seizure of bulk US currency and narcotics.

## Basis of Information for Search and Arrest Warrants

4.     The conclusions and opinions set forth below are based on my experience and training as a special agent, my direct participation in this investigation as described below, and conversations with other law enforcement officers who are familiar with the facts and circumstances of this investigation. Throughout this Affidavit, all sentences that begin with the words "I believe" are based upon this combination. Because this Affidavit is being submitted for the limited purpose of securing a Criminal Complaint, Arrest Warrants, and Search Warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary and appropriate to establish probable cause for the warrants requested herein.

## Overview of Persons to be Arrested and Places to be Searched

5.     This Affidavit is submitted in support of a request that a Criminal Complaint, Arrest Warrants and Search Warrants be issued for the following people and places related to violations of Title 21, United States Code, Sections 841 (a)(1) and 846, Distribution of Controlled Substances and Conspiracy to Distribute Controlled Substances. As set forth below, there is probable cause to believe that evidence (more particularly described in Attachment "B" and incorporated herein) tending to establish the existence of these violations is presently located at the following places (A-1 through A-18). A Criminal Complaint, Search Warrants and Arrest Warrants are being sought in the Eastern District of California.

### Individuals to be arrested:

1.     Francisco Javier Andrade FELIX (a.k.a. "Paco")
2.     Alejandro MARTINEZ (a.k.a. "Pelon", "Gallo", "El Gallo")
3.     Augustin RAMIREZ
4.     Miguel Angel FELIX (a.k.a. "Mili")
5.     Sergio MODESTO
6.     Antonio RAMIREZ (a.k.a. "Tonio")
7.     Gerardo BARRAZA
8.     Martin LOPEZ

### Additional individuals believed involved in the distribution of controlled substances:

1.     Alfonso MAGANA
2.     Daisy MEDINA
3.     Jesus DELGADO
4.     Josefina DELGADO-FELIX (a.k.a. "Chepina")
5.     Karla SILVA
6.     Leonaires ALCAUTER
7.     Martin RUBIO
8.     Rafael ALCAUTER
9.     Randy CARRILLO

10.    Raul RANGEL
11.    Salvador RODRIGUEZ
12.    Silbestre FELIX

**Places to be searched:**

1.    (A-1)   1700 Almond Avenue, Patterson, California (horse ranch property owned by Augustin RAMIREZ)

2.    (A-2)   1742 Almond Avenue, Patterson, California (horse ranch property 2 owned by Augustin RAMIREZ)

3.    (A-3)   541 Kristen Way, Mountain House, California (Francisco FELIX's primary residence)

4.    (A-4)   12737 Elm Avenue, Patterson, California (a secondary residence owned by Francisco FELIX)

5.    (A-5)   1602 Pomegranate Avenue, Patterson, California (Residence of Augustin RAMIREZ)

6.    (A-6)   818 N. Tuolumne Road, Ceres, California (Another residence associated with Francisco FELIX)

7.    (A-7)   2921 Georgia Court, Tracy, California (Residence of Jesus DELGADO, Josefina DELGADO-FELIX, and "Javi")

8.    (A-8)   523 Hatheway Street, Tracy, California (Residence occupied by Chuy LNU, Chuito LNU, and Silbestre FELIX)

9.    (A-9)   1301 North Vincent Road, Turlock, California (Residence occupied by Antonio RAMIREZ)

10.    (A-10)  1900 E. Grayson Road, Ceres, California (Residence associated with Francisco FELIX)

11.    (A-11)  3941 Northern Oak ~~Drive~~ *Drive*, Ceres, California (Residence of Miguel Angel FELIX)

12.    (A-12)  557 Traina ~~Court~~, Patterson, California (Residence of Alfonso MAGANA)

13.    (A-13)  2104 Manhattan Way, Modesto, California (Suspected marijuana grow house)

14.    (A-14)  18910 6th Avenue Stevinson, California (Residence of Emmanuel ARVIZU)

15.    (A-15)  2207 Orange Avenue, Patterson, California (Residence of Leonires ALCAUTER)

16.    (A-16)  1215 Golden Eye Court, Newman, California (Residence of Rafael ALCAUTER)

17.    (A-17)  27207 State Highway 33, Newman, California (Secondary residence of Rafael ALCAUTER)

18.    (A-18)  1840 Fort Hall Place, Stockton, California (Residence of Martin RUBIO)

*(Attachments A-1 through A-18 are attached hereto and incorporated by reference.)*

3

## OVERVIEW OF THE INVESTIGATION

6.     As will be shown and detailed throughout this affidavit, investigating agents believe Francisco FELIX, Alejandro MARTINEZ, Augustin RAMIREZ, Antonio RAMIREZ, Miguel FELIX, Sergio MODESTO, Gerardo BARRAZA, Martin LOPEZ, and others, both known and unknown, are part of an interstate and international methamphetamine and marijuana trafficking organization (DTO) (hereinafter the FELIX DTO) which is currently operating out of the Central Valley of California.  Agents also believe that these individuals are using the properties listed above to facilitate their operations.

7.     In January of 2013, a Confidential Reliable Informant (hereinafter CRI-1) provided information to California Department of Justice, Mountain and Valley Marijuana Investigation Team (MAVMIT) agents related to the FELIX DTO.[1]   CRI-1 informed MAVMIT agents that he had personally delivered methamphetamine to two adjoining horse ranch properties in Patterson, California, located at 1700 Almond Avenue (hereinafter TARGET PROPERTY 1) and 1742 Almond Avenue (hereinafter TARGET PROPERTY 2). CRI-1 also told investigators that he had recently received information from a FELIX family friend that the FELIX DTO was currently manufacturing methamphetamine at the horse ranch properties.

8.     Based in part on the information provided to law enforcement by CRI-1, agents initiated an investigation into the FELIX DTO. At the time CRI-1 provided this information to MAVMIT agents, he was actively signed up as a confidential reliable informant for this and other MAVMIT investigations.

9.     In early April of 2013, CRI-1 orchestrated a meeting between himself and a methamphetamine dealer working for Francisco FELIX named Raul RANGEL. This meeting was arranged by a nephew of Francisco FELIX named Javier LNU (hereinafter "Javier"). Javier contacted CRI-1 and told CRI-1 that he had spoken with Francisco FELIX and explained to him that CRI-1 was a good customer who was looking to purchase large amounts of methamphetamine. Javier relayed to CRI-1 that Francisco FELIX was ready and would have RANGEL contact CRI-1 shortly to arrange the deal.  Javier subsequently provided CRI-1 with Francisco FELIX's cellular telephone number and told CRI-1 that his uncle's nickname was "Paco."

10.     On April 3, 2013, CRI-1 was contacted by Raul RANGEL (a/k/a "Carlos"). During this recorded telephone conversation, CRI-1 told RANGEL that he needed one pound of methamphetamine. RANGEL told CRI-1 that he could provide that amount for $8,500. CRI-1 then asked if "Paco" (a/k/a Francisco FELIX) was going to be there for the one pound

---

[1] A CRI is an individual who provides information and assistance to law enforcement and is willing to testify. However, a CRI may refuse to testify against certain individuals based on their fear of retribution by those individuals. I know that a CRI will frequently provide information in exchange for consideration on pending criminal matters. In the federal system, indicted individuals provide information in exchange for a reduced sentence or for sentencing purposed under the safety valve provision. In California, many arrested individuals have an opportunity to enter into contractual agreements with law enforcement where, in exchange for their assistance with information and prosecution, pending charges against them are dismissed. Throughout this Affidavit any mention of a CRI will be referred to as "he" and "his" regardless of his/her actual gender.

methamphetamine transaction. RANGEL told CRI-1 that "Paco" would not be there because RANGEL was responsible for taking care of "Paco's" business for him.

11.     On April 4, 2013, RANGEL met with CRI-1 in a parking lot at a restaurant in Patterson, California.[2] After RANGEL arrived at this location, law enforcement officers observed him enter the passenger side of CRI-1's vehicle. Once inside, RANGEL and CRI-1 began to discuss the current sale of one pound of methamphetamine, as well as plans for future drug transactions. RANGEL told CRI-1 that the methamphetamine he was selling was the best around, the quality was guaranteed, and RANGEL could get plenty more if needed. When CRI-1 asked RANGEL about meeting "Paco," RANGEL responded that CRI-1 could possibly meet "Paco" "one day." CRI-1 then paid RANGEL $8,500.00 in prerecorded MAVMIT funds in exchange for 492 grams of methamphetamine. RANGEL then exited CRI-1's vehicle and drove away from the restaurant.

12.     Following this controlled buy, law enforcement agents followed RANGEL as he drove to the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2. Once at this location, RANGEL was observed meeting with an unidentified male. RANGEL departed from the horse ranch properties approximately eight minutes later.

13.     On or about April 25, 2013, CRI-1 spoke with RANGEL about conducting additional drug transactions. RANGEL told CRI-1 that if CRI-1 needed to do any additional drug business in the future, CRI-1 should call "Paco's old number" and ask to speak with "Pelon" (a.k.a. Alejandro MARTINEZ).

14.     When CRI-1 subsequently called "Pelon," the adult male who answered the phone identified himself as "Alejandro." During the call, Alejandro MARTINEZ told CRI-1 that he could help with whatever CRI-1 needed.

15.     On May 1, 2013, CRI-1 met with Alejandro MARTINEZ at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2. During their meeting, CRI-1 told Alejandro MARTINEZ that CRI-1's sibling was a semi-truck driver who transported between five to eight pounds of methamphetamine, and larger quantities of marijuana, to Chicago, Illinois, on a frequent basis. CRI-1 told Alejandro MARTINEZ his sibling was very interested in meeting with him to discuss business. In response, Alejandro MARTINEZ told CRI-1 that CRI-1's sibling could call him or meet with him at the horse ranch anytime. Alejandro MARTINEZ went on to tell CRI-1 that he could provide CRI-1 and CRI-1's sibling with outdoor grown marijuana at $1,000 per pound, or indoor grown marijuana at $2,000 per pound, as well as white or blue methamphetamine at $6,500.00 per pound if they purchased five to eight pounds at a time.

16.     On May 2, 2013, Alejandro MARTINEZ called CRI-1 and asked him if CRI-2 was ready to purchase the methamphetamine they had previously discussed. Alejandro MARTINEZ reiterated that, in addition to the methamphetamine, he could provide as much marijuana as CRI-2 needed, and was willing to show CRI-2 the product in advance.

---

[2] Prior to this meeting, CRI-1 was equipped with a recording device, which was monitored by law enforcement agents during the undercover event.

17.    On May 7, 2013, CRI-2, who had been previously equipped by law enforcement agents with an undercover transmitting device, arrived at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 and met with Alejandro MARTINEZ.  During the meeting, Alejandro MARTINEZ and other unidentified male co-conspirators that were present told CRI-2 they could get him methamphetamine at a rate of $12,500 per kilogram.  Alejandro MARTINEZ told CRI-2 that he could get him pounds of whatever color of methamphetamine he wanted and the purity would be guaranteed at 97%.  Alejandro MARTINEZ also told CRI-2 that he could get CRI-2 any amount of indoor or outdoor grown marijuana that CRI-2 needed.  In response, CRI-2 asked Alejandro MARTINEZ if he could get 100 to 200 pounds of marijuana for delivery to Chicago.  Alejandro MARTINEZ replied that that amount would not be a problem.  Alejandro MARTINEZ then showed CRI-2 a large black trash bag filled with marijuana, removed one pound of the marijuana, and gave it to CRI-2, explaining that the marijuana was indoor cultivated marijuana called "Daddy Kush" which typically sold for $2,000 per pound.  Alejandro MARTINEZ told CRI-2 that if CRI-2 transported and sold the "Daddy Kush" in Chicago, CRI-2 would double his profit.  CRI-2 subsequently purchased approximately 460 grams of presumptive positive marijuana from Alejandro MARTINEZ for $2,000.

18.    On May 17, 2013, during a recorded telephone call, CRI-2 contacted Alejandro MARTINEZ to arrange the purchase of methamphetamine.  During this telephone call, CRI-2 asked Alejandro MARTINEZ if he could come to TARGET PROPERTY 1 and TARGET PROPERTY 2 on May 21st to purchase the methamphetamine.  Alejandro MARTINEZ agreed that the 21st would work, and told CRI-2 that he had what CRI-2 needed.[3]

19.    On May 30, 2013, SA Steve Weinstock (MAVMIT) observed Francisco FELIX arrive at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 driving a black Yukon Denali, California license plate 6JZG740, registered to Francisco FELIX.[4]  Directly behind Francisco FELIX's vehicle was a maroon 1987 Mercedes Benz, California license plate 3DCW665, registered to Augustin RAMIREZ.  Both subjects were observed leaving the horse ranch properties shortly after their arrival.

20.    On May 30, 2013, at approximately 5:12pm, CRI-2 arrived at the horse ranch properties and met with Alejandro MARTINEZ.  Alejandro MARTINEZ told CRI-2 that CRI-2's methamphetamine shipment had been delayed and would not arrive until the following day.  When CRI-2 explained that he needed methamphetamine now, Alejandro MARTINEZ made a telephone call to an individual he referred to as "Tonio" (subsequently identified as Antonio RAMIREZ).  The pen register for Alejandro MARTINEZ's phone indicated that the call MARTINEZ made at this time was to telephone number 209-262-5807.  At the conclusion of this call, Alejandro MARTINEZ told CRI-2 that Tonio could get CRI-2 20-30 pounds of methamphetamine, and currently had a kilogram of methamphetamine at his house set aside for CRI-2.

---

[3] MAVMIT and HSI agents were not able to conduct this undercover operation until May 30, 2013. There were several telephone calls between CRI-2 and MARTINEZ on 5809 to discuss the date changes.

[4] SA Weinstock was able to positively identify Francisco FELIX as the driver from FELIX's California driver's license photograph.

21.     CRI-2 agreed to drive with Alejandro MARTINEZ to Antonio RAMIREZ's house, located at 1301 North Vincent Road in Turlock, California (hereinafter TARGET PROPERTY 9), to retrieve the kilogram of methamphetamine.[5]  The two drove together in a silver Nissan Maxima, California license plate 6RUR183, registered to Jose ALCAUTER.

22.     Upon arrival at TARGET PROPERTY 9, CRI-2 and Alejandro MARTINEZ entered the residence and met with Antonio RAMIREZ. Due to an apparent misunderstanding, Antonio RAMIREZ had thought that CRI-2 was interested in purchasing a kilogram of marijuana, not methamphetamine. Antonio RAMIREZ explained to CRI-2 that he did not currently have a kilogram of methamphetamine available, but that he could get CRI-2 20-30 pounds of methamphetamine the following day for $6,000-$7,000 per pound.  Antonio RAMIREZ then offered to sell CRI-2 two pounds of marijuana that Antonio RAMIREZ currently had in his possession.  CRI-2 agreed and purchased approximately 862 grams of marijuana from Antonio RAMIREZ.

23.     On June 14, 2013, at approximately 2:24 pm, CRI-2 contacted Alejandro MARTINEZ and ordered a half pound of methamphetamine.  Alejandro MARTINEZ explained that he could arrange the deal, and the two agreed to meet at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 on June 19, 2013.  Through pen register analysis, agents noted that at approximately 2:35 pm, Alejandro MARTINEZ called (209) 262-5807, a telephone number associated with Antonio RAMIREZ (a.k.a "Tonio").

24.     On June 19, 2013, CRI-2 arrived at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2, and met with Alejandro MARTINEZ.[6] During this meeting, Alejandro MARTINEZ sold CRI-2 approximately 440 grams of methamphetamine for $7,000.  After the transaction was complete, CRI-2 and Alejandro MARTINEZ again discussed a 20-30 pound methamphetamine deal in the future.  Alejandro MARTINEZ told CRI-2 that he could provide that amount of methamphetamine to him at a discounted price.

25.     Through pen register analysis, agents noted that Francisco FELIX sent two text messages to Alejandro MARTINEZ during Alejandro MARTINEZ's June 19th meeting with CRI-2.

26.     On July 16, 2013, Alejandro MARTINEZ sent a text message to CRI-2 asking, "whats up?" At the direction of SA Olivera, CRI-2 called Alejandro MARTINEZ back and discussed future drug purchases.  During the call, Alejandro MARTINEZ asked CRI-2 if he needed anything because Alejandro MARTINEZ had "product" available.[7]  CRI-2 told Alejandro MARTINEZ that his group liked the quality of the methamphetamine Alejandro MARTINEZ had previously sold to him and that he was waiting to hear back from them about acquiring more.

---

[5] SA Heredia and SA Laughlin maintained constant audio and visual surveillance of Alejandro and CRI-2 during this trip.

[6] SA Olivera and SA Jakabosky conducted audio and visual surveillance of this meeting.

[7] It is the belief of your affiant that "product" was code for methamphetamine.

27.     On July 18, 2013, HSI SA Sean Crooks conducted aerial surveillance of the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2.  Based on his training and experience, SA Crooks identified approximately 50 marijuana plants growing on TARGET PROPERTY 1.  That same day, SA Crooks also conducted aerial surveillance of 12737 Elm Avenue in Patterson, California (hereinafter TARGET PROPERTY 4), a property owned by Francisco FELIX.  At that location, SA Crooks observed approximately 100 marijuana plants growing.

28.     On July 18, 2013, agents observed Francisco FELIX drive from TARGET PROPERTY 2 in his black Nissan Maxima, bearing California license plate 6WXS214,  to 818 W Tuolumne Road in Ceres, California (hereinafter TARGET PROPERTY 6).  According to local law enforcement detectives in Modesto, TARGET PROPERTY 6 is associated with a suspected drug cartel related double homicide that occurred in 2010.  The victims of that homicide, Jose and Luis VILLARUBIO, have still not been located.  Francisco FELIX remains a suspect in that homicide investigation.

29.     When Francisco FELIX arrived at TARGET PROPERTY 6 on July 18, 2013, agents observed a black Chevrolet truck bearing California license plate 8W17520 parked in the driveway of that location.  When agents queried the license plate number for this Chevrolet truck through the HSI databases, they learned that this vehicle was inspected at the San Ysidro point of entry (POE) by Customs and Border Protection (CBP) officials on September 21, 2010.  During that search, CBP officials discovered a non-factory manufactured hidden compartment located in the center console area of the vehicle.  Per CBP, this hidden compartment appeared capable of transporting firearms, narcotics or US currency.  The vehicle was found not to be transporting any contraband on that day and was allowed to leave secondary inspection.

30.     On July 18, 2013, HSI SA Sean Crooks conducted aerial surveillance of TARGET PROPERTY 6.  Based on his training and experience, SA Crooks identified approximately 75 marijuana plants growing on TARGET PROPERTY 6.

31.     Approximately 90 minutes after arriving at TARGET PROPERTY 6, Francisco FELIX departed that location and drove to 1900 E. Grayson Road in Modesto, California (hereinafter TARGET PROPERTY 10).  Pen register data for Francisco FELIX's phone shows that while he was at TARGET PROPERTY 10, Francisco FELIX made a five minute phone call to an unknown individual. [8]  As soon as the phone call ended, law enforcement agents observed an unidentified individual walk from the area of the residence to the side of Francisco FELIX's vehicle.

32.     SA Crooks subsequently conducted aerial surveillance of TARGET PROPERTY 10.  Based on his training and experience, SA Crooks identified approximately 75 marijuana plants growing on TARGET PROPERTY 10.  After leaving TARGET PROPERTY 10,

---

[8] Subscriber information for this phone returns to Maria PEREZ at 431 Pine Street in Modesto, California.  Current checks of CP Clear show prior addresses for Maria Perez at both 431 Pine Street in Modesto, California and 1900 E. Grayson Road in Modesto, California (TARGET PROPERTY 10).

Francisco FELIX drove to what investigation has confirmed is his primary residence, 541 Kristen Way in Mountain Home, California (hereinafter TARGET PROPERTY 3).

33.     On July 18, 2013, Alejandro MARTINEZ contacted CRI-2. During their conversation, CRI-2 and Alejandro MARTINEZ agreed to meet on July 25th to discuss a large purchase of methamphetamine. Alejandro MARTINEZ also agreed to bring his "boss" to the meeting so that CRI-2 could meet him. Alejandro MARTINEZ then asked CRI-2 if he could borrow $1,000, which CRI-2, at the direction of investigators, agreed to provide. However, CRI-2 told Alejandro MARTINEZ to get CRI-2 one ounce of cocaine for him in return for the $1,000 loan. Alejandro MARTINEZ agreed to do this.

34.     On July 19, 2013, SA Olivera deposited $1,000 into a bank account number provided by Alejandro. The name associated with this account was "Magdalena Guardado."

35.     On July 25, 2013, CRI-2 traveled to the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 to collect the one ounce of cocaine Alejandro MARTINEZ owed him. During the meeting, Alejandro MARTINEZ told CRI-2 that the cocaine was in Los Angeles, but he could provide CRI-2 with a pound of methamphetamine in place of the cocaine for $7,000. CRI-2 agreed and gave Alejandro MARTINEZ $500 towards the price of the pound of methamphetamine. When Alejandro MARTINEZ gave CRI-2 the pound of methamphetamine, which was concealed in a Tupperware style container, Alejandro MARTINEZ told CRI-2 that he would put the $1,000 he owed CRI-2 and the $500 CRI-2 had just provided, towards the price of the pound of methamphetamine. Alejandro MARTINEZ told CRI-2 that when CRI-2 came up with the remaining $5,500, CRI-2 could give it to him. Additionally during this meeting, CRI-2 told Alejandro MARTINEZ that he could help him acquire assault rifles and other firearms CRI-2 needed.

36.     Alejandro MARTINEZ removed the pound of methamphetamine he gave to CRI-2 from a refrigerator in a barn at the horse ranch. CRI-2 could see inside the refrigerator and saw at least five additional Tupperware-style containers.

37.     Also during this meeting, Alejandro MARTINEZ introduced CRI-2 to Sergio MODESTO. MODESTO subsequently offered to sell cocaine to CRI-2 for $22,000 a kilogram, as well as methamphetamine for $12,500 per kilogram. MODESTO told CRI-2 that he could take CRI-2 to Los Angeles to pick up the cocaine and methamphetamine or he could have it delivered. MODESTO told CRI-2 the price for both drugs would be higher if the cocaine or methamphetamine was delivered.

38.     On August 5, 2013, CRI-2 contacted Alejandro MARTINEZ and informed him that he would be depositing $2,000 into Alejandro MARTINEZ's account and would bring the remaining cash owed for the pound of methamphetamine to the horse ranch properties on August 14, 2013. CRI-2 also told Alejandro MARTINEZ that he needed an AK-47 by August 14, 2013.[9] Alejandro MARTINEZ told CRI-2 that he would work on getting the gun. A short time later,

---

[9] During the July 25, 2013, meeting, Alejandro had told CRI-2 that he could secure an AK-47 for CRI-2.

Alejandro MARTINEZ texted CRI-2 a Bank of America account number in the name of "Jose Adrian Blanco," and instructed CRI-2 to deposit the $2,000 into that account.

39.     On August 7, 2013, SA Olivera deposited $2,000 into the aforementioned account and then directed CRI-2 to contact Alejandro MARTINEZ. During the recorded call, CRI-2 told Alejandro MARTINEZ that the money was in his account. CRI-2 then asked Alejandro MARTINEZ about the AK-47, and Alejandro MARTINEZ told CRI-2 that the guy with the guns would be at the horse ranch the following day.

40.     On August 13, 2013, during a recorded telephone call, CRI-2 contacted Alejandro MARTINEZ. During the telephone call, CRI-2 asked if the rifle would be ready for pick up on August 14th. Alejandro MARTINEZ said that the rifle would be ready and the guy bringing it would be at the horse ranch. When CRI-2 asked Alejandro MARTINEZ about the price of the firearm, Alejandro MARTINEZ stated that he did not want to discuss the price over the telephone.

41.     Following this call, Alejandro MARTINEZ texted CRI-2 with a photograph of a Fabrique Nationale Herstal (hereinafter FN Herstal) .223 caliber semi-automatic handgun and asked CRI-2 if he was interested in the firearm. Following this text, CRI-2 received additional text messages sent by Alejandro MARTINEZ which included photographs of two assault rifles both equipped with 30 round magazines. CRI-2 told Alejandro MARTINEZ that he was interested in all of the firearms. Pen register analysis showed that after texting CRI-2, Alejandro MARTINEZ contacted 209-380-6754. The listed subscriber for this telephone number is Gerardo BARRAZA.

42.     On August 14, 2013, CRI-2 drove to the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 and met with Alejandro MARTINEZ and Sergio MODESTO. Alejandro MARTINEZ told CRI-2 that the guy bringing the guns to the ranch would not be there for several hours. With time to spare, CRI-2 told Alejandro MARTINEZ that he had to leave the ranch to run some "errands," but would be back in time to conduct the deal. Unexpectedly, Alejandro MARTINEZ directed MODESTO to go with CRI-2 on CRI-2's "errands."

43.     During the time CRI-2 was with MODESTO, MODESTO told CRI-2 that his first name was "Sergio," that he was a delivery guy for Alejandro MARTINEZ, and that he did what he was asked to do by Alejandro MARTINEZ and "Paco." MODESTO once again told CRI-2 that he could get cocaine for CRI-2 though his uncle, who lived in Mexico and imported cocaine into the United States. MODESTO told CRI-2 that he could take CRI-2 to Los Angeles and they could look at the cocaine. CRI-2 then asked MODESTO if he could call his uncle in Mexico. When MODESTO responded that he could not call Mexico from his phone, CRI-2 handed MODESTO his own phone which MODESTO used to call the following Mexican telephone number two times: 5213318348571. A subsequent check of this telephone number by investigators revealed that it had been listed as a "telephone number of interest" in at least one DEA investigation for narcotics trafficking. However, investigators have since confirmed with DEA that the telephone number is no longer being used.

44.     At approximately 4:11pm, CRI-2 and MODESTO returned to the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2and met with Alejandro MARTINEZ. Pen register analysis showed that Alejandro MARTINEZ texted 209-380-6754 (the subscriber for this telephone number is Gerardo BARRAZA) at 4:20 pm and 4:56 pm and subsequently received text messages from that number. At 5:31 pm, Alejandro MARTINEZ called 209-380-6754 (subscriber Gerardo BARAZA) and, at the conclusion of the telephone call, told MODESTO to go with CRI-2 to Stockton to pick up the guns.

45.     At approximately 5:30 pm, CRI-2 and Sergio MODESTO departed the horse ranch properties in CRI-2's vehicle.[10] On their way to meet pick-up the guns, MODESTO told CRI-2 that he needed to make a stop in Ceres to pick up money for "Paco." When CRI-2 asked MODESTO who "Paco" was, MODESTO responded that "Paco" was the man in charge. Your affiant knows through this investigation that "Paco" is an alias for Francisco FELIX. After stopping in Ceres, CRI-2 and MODESTO continued on to Stockton.

46.     Pen register analysis for this day shows that at 4:55 pm, a one minute and twenty second call was placed between 510-427-7446 (listed subscriber for this number is Francisco FELIX) and 323-320-2926 (listed subscriber for this telephone is Sergio MODESTO).

47.     At approximately 8:26 pm, a black Yukon, bearing California license plate 6FDJ147 and registered to Gerardo BARRAZA, drove into a parking lot in Stockton where CRI-2 and MODESTO were waiting in CRI-2's vehicle. CRI-2 exited his vehicle and got into the back passenger seat of the Yukon. Once inside, CRI-2 spoke with "Tavo" and another individual CRI-2 later identified as Gerardo BARRAZA about purchasing firearms.[11] During the conversation, BARRAZA presented CRI-2 with a Ruger Mini 30 rifle and a Norinco SKS rifle.[12] After inspecting the firearms, CRI-2 paid Tavo $2,200 for them. Before CRI-2 left the Yukon, Tavo and BARRAZA told CRI-2 that they could get him additional "clean" handguns, as well as AK-47 assault rifles, and even a 50 caliber rifle if needed.

48.     When CRI-2 returned to his vehicle with the firearms, MODESTO called Alejandro MARTINEZ and told him they were on their way back to the horse ranch properties with the guns. When CRI-2 asked MODESTO what Alejandro MARTINEZ had to say about the guns, MODESTO said that Alejandro MARTINEZ was happy about the guns and wanted to let him know "the boss" was at the ranch. CRI-2 asked MODESTO who "the boss" was, to which MODESTO replied, "Paco's the boss."

49.     At approximately 10:25 pm, CRI-2 and MODESTO arrived back at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 and met with Alejandro MARTINEZ. When CRI-2 offered to show Alejandro MARTINEZ the firearms he had just purchased, Alejandro MARTINEZ declined, explaining that "Paco" was there and was with someone. CRI-2 then asked Alejandro MARTINEZ who owned the black Corvette that was parked at the ranch. Alejandro MARTINEZ told CRI-2 that the car belonged to "Paco."

---

[10] SA Olivera and SA Laughlin conducted audio and visual surveillance of this trip.

[11] Identification made by reviewing Gerardo BARRAZA's California driver's license photograph

[12] Both firearms were subsequently tested by firearms experts with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), who determined that the rifles were semi-automatic firearms.

When CRI-2 asked who "Paco" was, Alejandro MARTINEZ responded, "Paco is the boss." Alejandro MARTINEZ then offered to introduce CRI-2 to "Paco."

50.     A short time later, CRI-2 followed Alejandro MARTINEZ to another area of the horse ranch properties where they met with Francisco FELIX. As they approached Francisco FELIX, Alejandro MARTINEZ told CRI-2, "this is Paco, he is the man in charge, he owns the Corvette." After exchanging introductions, Francisco FELIX and CRI-2 talked about Francisco's vehicles. Francisco FELIX even allowed CRI-2 to test drive the Corvette.

51.     When CRI-2 returned to the ranch after the test drive, he noticed that Francisco FELIX was speaking with Augustin RAMIREZ. RAMIREZ is the owner of the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2, and the reported uncle to Francisco FELIX. At one point during this discussion, Francisco FELIX turned to Augustin RAMIREZ and asked if he remembered the time when they "were partying with 'El Mayo' ZAMBADA in Mexico?"

52.     A short time later, Francisco FELIX asked CRI-2 where he was living and if he took "shit" up north. CRI-2 told Francisco FELIX that it wasn't worth it to take anything north because it was basically legal up there. Francisco FELIX then asked CRI-2 if he took narcotics to other states, and CRI-2 replied that he could take it anywhere he was told to, and had in the past transported narcotics to Boston, Atlanta, Charlotte, Cleveland, Seattle, and Chicago. When Francisco FELIX asked CRI-2 about the largest amount of narcotics he had ever transported, CRI-2 responded that the largest load of crystal he had ever moved in his semi-trailer was 100 pounds. CRI-2 told Francisco FELIX that he typically transported anywhere from $800,000 to $1,000,000 in cash back to California on the return trip. In response to this information, Francisco FELIX turned to RAMIREZ and said, "Now that's what I've been looking for." Francisco FELIX then told CRI-2 that he could get him 50 pounds of methamphetamine right now for delivery if CRI-2 had buyers. CRI-2 told Francisco FELIX that he had buyers, but they were currently trying to get rid of stuff he had previously delivered.

53.     On September 18, 2013, CRI-2 contacted Alejandro MARTINEZ to inquire about purchasing additional firearms. This call was subsequently verified through a review of toll records for Alejandro MARTINEZ's phone. The following is a translation of key segments of the recorded conversation:

- **CRI-2:** What's going on? I'm getting ready to go over there. Are those things ready?
- **Alejandro:** Maybe tomorrow he'll come over. The young guy was busy, and tomorrow he'll bring those things over.
- **CRI-2:** Okay, the one from the photo? You have that one there so I can pick that one up?[13]
- **Alejandro:** The one from the little photo?
- **CRI-2:** Yes.
- **Alejandro:** Yes, it's the same guy that is going to get me the other one. He'll bring them over tomorrow.

After a review of the content of this recorded conversation, and based on your affiant's experience and knowledge of this investigation, your affiant believes that Alejandro MARTINEZ was referring to two firearms during this call when he mentioned "the young guy . . . bring[ing] those over." It is also your affiant's belief that one of those firearms was the AR-15 that Alejandro MARTINEZ had previously texted a photograph of to CRI-2.

54.     Around 9:00 am on September 19, 2013, SA Crooks observed Francisco FELIX leave TARGET PROPERTY 3 (Francisco FELIX's primary residence) and drive to TARGET PROPERTY 4 (a secondary residence for Francisco FELIX which is currently under construction) where he met with an unidentified adult male. As Francisco FELIX and the adult male walked the property line, SA Crooks observed two additional adult males working in a marijuana cultivation site located on TARGET PROPERTY 4. SA Crooks estimated that there were 30 - 50 very large marijuana plants still under cultivation on the property.

55.     After meeting briefly with the individuals cultivating the marijuana garden at TARGET PROPERTY 4, Francisco FELIX drove to the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2, where he met with several other unidentified men who were similarly working at a marijuana cultivation site at that location. SA Crooks observed over 50 large marijuana plants under cultivation at TARGET PROPERTY 1 during their surveillance of that location that day.

56.     At approximately 12:43pm on September 19, 2013, CRI-2 arrived at the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2, and met with Francisco FELIX.[14]   During the meeting, Francisco FELIX and CRI-2 talked about the purchase of methamphetamine. At one point, Francisco FELIX told CRI-2, "Just tell me how many you want, I have 200 pounds of crystal meth right now, it was all cooked in Culiacan, Mexico, and it has never been stepped on, it is guaranteed." CRI-2 responded that his group wanted to do three pounds to start to make sure that all three pounds were the same and of good quality.

57.     On September 23, 2013, CRI-2 contacted Alejandro MARTINEZ to confirm that the firearms (referenced in paragraph 83) were ready for purchase. This call was subsequently verified through a review of toll records for **Target Telephone 2**. The following is a translation of key segments of the recorded conversation:

- CRI-2:  What's with the order?  Is it going to happen?
- MARTINEZ:  They are going to bring them to me tomorrow.
- CRI-2:  Is it going to be both of them, or just one?
- MARTINEZ:  Right now we are looking, one is ready.  He is going to call his other friend to see if he would bring him the other one.  It's for sure.

After a review of the content of this recorded conversation, and based on your affiant's experience and knowledge of this investigation, your affiant believes that the "one" and the "other one" mentioned during this telephone conversation were references to firearms.

---

[14] This meeting was audio-recorded via a body wire on CRI-2's person.

58.     On September 24, 2013, CRI-2 met with Alejandro MARTINEZ at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2.[15]  Upon arrival, Alejandro MARTINEZ told CRI-2 that the guns were on their way.  Shortly thereafter, an unidentified individual (hereinafter "gun broker") arrived at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 with an AR-15 rifle.  The gun broker told CRI-2 that he could sell the AR-15 to CRI-2 for $800.  The gun broker also told CRI-2 that he could get AK-47s and UZIs from gang members in the Stockton and Manteca areas.  The gun broker invited CRI-2 to come to the Bass Pro Shop in Manteca, where the gun broker worked, to look at the firearms.  The gun broker told CRI-2 that he could get CRI-2 any of the firearms without paperwork.  CRI-2 subsequently described the gun broker to your affiant as a younger Hispanic male in his mid-20's.  Agents believe the gun broker is the "young guy" referenced in paragraph 53 above.

59.     Following the meeting, agents observed the gun broker drive from the horse ranch properties to TARGET PROPERTY 9.  Agents observed the gun broker's vehicle park at the residence and then leave the location approximately five minutes later after picking up two additional passengers from TARGET PROPERTY 9.

60.     After the meeting with the gun broker, CRI-2 spoke with Alejandro MARTINEZ and Francisco FELIX.  When Alejandro asked CRI-2 when he was going to be ready to do the methamphetamine deal, CRI-2 responded that he would do three pounds first, then 35 pounds.

61.     On September 29, 2013, Alejandro MARTINEZ called CRI-2 to discuss the firearm purchase previously negotiated at the horse ranch on September 24, 2013.  Although this telephone conversation was not recorded, law enforcement agents debriefed CRI-2 about the content of the conversation shortly after the call took place.  During the debrief, CRI-2 relayed that he had asked Alejandro MARTINEZ about the availability of the firearms previously discussed, referring to them during the telephone conversation as "toys."  CRI-2 told law enforcement agents that Alejandro MARTINEZ had responded that "the guy" could line up "two toys" with one day's notice.

62.     On October 2, 2013, at approximately 3:49 pm, CRI-2 contacted Francisco FELIX.  This telephone call was recorded.  The following is a translation of key segments of the recorded conversation:

- FELIX:  We are also going to have some of our girls.
- CRI-2:  Okay.
- FELIX:  So you can take some.
- CRI-2:  That's what I was going to talk to you about, about the three chickens, the ones we talked about the other day.  What phone number are you going to put, so I can take it to those guys.
- FELIX:  I told him you were going there, you can take them and we will go in half.

---

[15] This meeting was audio-recorded via a body wire on CRI-2's person.

- CRI-2: I already told them I was going to get 30 for [unintelligible]. The other twenty, you and I can go in half and half.
- FELIX: So you want to buy the other one's here?
- CRI-2: I told the others that I could buy them here, but I told them to have the newspaper, the paper only for 30. The other 20 we are going to take, but we are going to have to wait a day for the money.
- FELIX: I thought we were going to put all of them to send there, without money. I was going to put them, and you and I were going to go in half and half. I thought we were going to buy them here though.
- CRI-2: Okay, that's even better.
- FELIX: That way there is business for you and me. Because if we buy them all there, then that does not make sense.
- CRI-2: Okay, and when I come pick-up the three chickens, it's because they want to see them first.
- FELIX: The work is good, clean, on point.
- CRI-2: Yes.
- FELIX: Don't think it's going to be dirty work or anything like that. It's clean work.
- CRI-2: Okay, but I want to know how much paper I need to bring with me so I can take those three only.
- FELIX: Okay. I think it's about 12 and up.
- CRI-2: Okay. That's it?
- Francisco FELIX: For there and up we can get it, then talk to see what's up.[16]

After a review of the content of this recorded conversation, and based on your affiant's experience and knowledge of this investigation, your affiant believes that Francisco FELIX discussed the sale of methamphetamine to CRI-2. Referring to it as "girls" and "chickens," Francisco FELIX assured CRI-2 that the methamphetamine would be high quality – "clean work," not "dirty work." Francisco FELIX also set the price for three pounds of methamphetamine at $12,000 when he responded to CRI-2's question about "how much paper [he] need[ed] to bring" with the statement, "I think it is about 12 and up."

63.    On October 17, 2013, CRI-2 contacted Alejandro MARTINEZ to ask about the "toys."[17] This telephone call was recorded and witnessed in real time by SA Olivera and your affiant. The following is a translation of key segments of the conversation which followed:

- CRI-2: I'm calling you to ask you what's up with the toys.
- MARTINEZ: Oh, yeah, I think tomorrow, so you can come then.

---

[16] This recorded telephone conversation is consistent with previous conversations CRI-2 and Francisco FELIX had on September 19 and 24, 2013, at the Patterson horse ranch properties.
[17] It is the belief of your affiant that "toys" was code for the assault rifles negotiated for on September 24, 2013.

CRI-2 responded that he would probably not be able to come by until the following week to pick up the "toys." CRI-2 then continued by asking Alejandro MARTINEZ about the three pound methamphetamine deal he had previously discussed with Francisco FELIX.

- CRI-2:  Tell that guy about the three little chickens . . . tell him about, maybe I will pick them up when I come over.
- MARTINEZ:  Okay, Okay, that's good.  I'll tell him.
- CRI-2:  Please tell him to have them ready and I'll call you on Monday or Tuesday, when I come down.
- MARTINEZ:  Okay, that's good.

After a review of the content of this recorded conversation, and based on your affiant's knowledge and experience, your affiant believes that "toys" refers to firearms and "three little chickens" refers to three pounds of methamphetamine.

64.    On October 30, 2013, the Honorable William B. Shubb, United States District Court Judge, approved the interception of wire communications to and from telephone number 510-427-7446, a telephone number subscribed to and used by Francisco FELIX, and telephone number 209-535-2168, a telephone number used by Alejandro MARTINEZ.   Interception of both telephones began on October 31, 2013.[18]

65.    Throughout the first week of intercepted calls, Francisco FELIX and CRI-2 continued to discuss the purchase of three pounds of methamphetamine and the delivery of those drugs to buyers in Chicago, Illinois. CRI-2 told Francisco FELIX that if the buyers liked the quality and price of the three pounds of methamphetamine, they would be interested in purchasing larger quantities of methamphetamine from Francisco FELIX in the future.

66.    The following call, intercepted over Francisco FELIX's telephone on November 2, 2013, is an example of one such conversation:

- FELIX: What's going on boss, what do you say?
- CRI-2: What a miracle dude.  You don't Check in.
- FELIX: Yeah, I, I am just waking up, I have been sleeping for about two days.
- CRI: [U/I].  So what?
- FELIX: Just here, just here doing nothing.  Working, sleepless.  What's new?
- CRI-2: I was working dude, I was working.  My truck broke down last week and [U/I] and I had to go fix it, pick the guy up all the way to where he was.
- FELIX: Oh my god and that?
- CRI-2: Well you know, damn drives don't take care of things and [U/I].
- [VOICES OVERLAP]
- FELIX: [U/I].  Well you have to give them good instruction so they won't break

---

[18] The descriptions set forth below are not verbatim accounts; rather, they are based upon initial summaries and draft transcripts. As such, it is possible that there will be some discrepancies between the descriptions set forth below, and the final transcripts, once those transcripts are prepared.

down.
- CRI-2: [LAUGHS]
- FELIX: Yes, I don't..,
- CRI-2: No but what happens is that if I don't .., I am over here for some three days.
- FELIX: Oh, here in Sacramento?
- CRI-2: No, up here in Washington.
- FELIX: Oh, alright, alright. That's fine and when are you going to come toward this direction?
- CRI-2: Well that is why I wanted to talk to you. I wanted to talk to you to, to see if there was going to be a chance for you to get me the uh, the chicks, the three little chicks.
- FELIX: Okay, well let me uh, make a call down there that's all. By [STAMMERS] what day will you be arriving?
- CRI-2: Uh, well. I am going to take off on Monday and I will be here one day, two days, I think that about by Thursday.
- FELIX: By Thursday?
- CRI-2: By Thursday or Friday. Uh-huh.
- FELIX: Okay, well that's fine just call me when you arrive and just tell me so I can tell them and they can go pick them up or something.
- CRI-2: Yes, because they all ready, they all ready asked for uh, the other that we had talked about. About the other ones.
- FELIX: Yes.
- CRI-2: The bunch of chick's, uh-huh.
- FELIX: Uh-huh.
- CRI-2: So then he told me okay then bring those and I will take them to him so that, so that he can look at them and, and if they are like that real pretty the girls, that they are real good..,
- FELIX: Uh-huh.
- CRI-2: Then we will make arrangements to take the other ones. The whole bunch.
- FELIX: No, well that's fine. We will do it like that then.
- CRI-2: Well then you tell me how, I, I will talk to you over there when I go down there then. So that we can talk better and we can come to an agreement on how we are going to take, to take that there.
- FELIX: Okay, that's fine, that's fine. Then I will see you over here when you arrive.
- CRI-2: All right then you said it.
- FELIX: All right then. All right then.
- CRI-2: Go by [U/I].
- FELIX: All right then, bye.

Investigators believe that during this call Francisco FELIX and CRI-2 discussed the purchase of three pounds of methamphetamine, which was referred to as "three little chicks."

67.   On November 7, 2013, agents intercepted a call between Francisco FELIX and an individual later identified as "Chuy," who was using telephone number 510-338-5083. The subscriber listed for this telephone number is Chamba Chamba at PO Box 54988 in Irvine, California.[19]

68.   During this call, Chuy asked Francisco FELIX if he knew of "someone who needs girls over there," because he had "around six hundred." Francisco FELIX asked Chuy, "Which one is the one you have?" Chuy responded, "The Grand." Francisco FELIX then asked Chuy if he had any of the "O." Chuy responded that he may have a few.

69.   Your affiant believes, based upon training, experience, and my investigation of this matter, that during this call Francisco FELIX and Chuy discussed the availability of approximately 600 pounds of marijuana. I also believe that when Chuy mentioned "the Grand," he was referring to a marijuana strain recognized as "Grand Daddy Purple." Moreover, when FELIX inquired about the "O," he was inquiring about a marijuana strain recognized as "OG Kush."

70.   This call was one of several intercepted between Francisco FELIX and Chuy involving coded conversations which agents believe pertained to the cultivation and trafficking of marijuana. In December of 2013, SA Olivera obtained a GPS location order for 510-338-5083 (the telephone number used by Chuy). The GPS location data indicated that the telephone was consistently located at 523 Hatheway Street in Tracy, California (hereinafter TARGET PROPERTY 8).

71.   On November 8, 2013, CRI-2 met with Francisco FELIX and Alejandro MARTINEZ at the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2.[20] During the meeting, Francisco FELIX advised CRI-2 that his shipment of methamphetamine would not arrive until November 10th. Francisco FELIX then talked with CRI-2 about the future delivery of 50 pounds of methamphetamine to Chicago, Illinois. Francisco FELIX told CRI-2 that he would supply CRI-2 with 50 pounds of methamphetamine so that CRI-2 could transport the methamphetamine in his truck to Chicago, deliver the narcotics, and then return to California with the money.

72.   During this same conversation, Francisco FELIX asked CRI-2 if he would be willing to transport seven to ten kilograms of cocaine "back east" for one of his "guy's" during the same trip. After CRI-2 stated that he would be willing to include the cocaine in the trip, Francisco FELIX made the following intercepted call to Miguel FELIX (aka "Mili") regarding the transportation of cocaine. During the call, Francisco FELIX repeatedly asked CRI-2 questions about what CRI-2 would charge to transport the cocaine for his friend.

---

[19] Agents believe that this subscriber information is false. Based on your affiant's knowledge, training, and experience, your affiant knows that narcotics traffickers will regularly provide false, incomplete, or misleading information in an attempt to mask their identity and hinder law enforcement, and agents believe that this subscriber information is false.

[20] Prior to this meeting, CRI-2 was equipped with a recording device, which was monitored by law enforcement agents during the undercover event.

- Francisco FELIX:  [Aside conversation: help him out to get the doors out because [U/I] are getting out.]  What's up, buddy?
- Miguel FELIX: What's going on?
- Francisco FELIX:  I couldn't hear anything on the phone.
- Miguel FELIX: Oh, and like I was asking you; is he charging me one peso/buck to bring the money down as well or is he charging me extra to bring down the money.
- Francisco FELIX:  I don't think so, I think he's got a load heading this way already, therefore he will bring everything all together.
- Francisco FELIX [Background conversation]: Ask him how much is he going to pay for bringing the money down?
- Francisco FELIX:  He's asking how much are you going to pay him for bringing it down?
- Miguel FELIX:  That's why I'm asking…
- Francisco FELIX:  [U/I].
- Miguel FELIX:  That's why I'm asking if he will charge me the same or how much will he charge additionally.
- Francisco FELIX:  Well, he's here right now asking me how much you would pay him to bring the money down too.
- Miguel FELIX:  I don't know, you ask him.
- Francisco FELIX  [Background conversation]: [MUMBLES] [U/I], buddy I don't really know what to tell you because this is not my deal [STAMMERS] [
- Miguel FELIX: [STUTTERS] Tell the guy that if he's interested in more work like this, I can find more raza to work with him. Trustworthy people and he can go up north too.
- Francisco FELIX [Background conversation]: He says if you're interested in more work, he can get you work up there all the way up to [U/I]. [21]
- Francisco FELIX:  He said that the load he's driving right now is heading towards Indianapolis.
- Miguel FELIX:  Yes, but I don't have any right now, that's the true. I don't have any right now…when is he planning to head out?
- Francisco FELIX [Background conversation]: When are you leaving?
- Francisco FELIX:  He's just only waiting for girls I asked you for earlier, the three I asked you for.
- Miguel FELIX:  Oh, [STAMMERS] let me see if I can get some right now. Let me see what I can do.
- Francisco FELIX:  Alright, make sure to get the ones I asked you for, for my buddy.  He needs three.
- Miguel FELIX: Alright then.
- Francisco FELIX:  Alright.
- Miguel FELIX: Bye.

---

[21] CRI-2 was the individual that Francisco FELIX was speaking with in the background during this call.

Investigators believe that during this call, Francisco FELIX and Miguel FELIX discussed the
possibility of CRI-2 transporting cocaine for Miguel FELIX. Moreover, Francisco FELIX asked
Miguel FELIX about the availability of three pounds of methamphetamine, which he referred to
as "three girls."

73.     After this call ended, CRI-2 asked Francisco FELIX again about the three pounds
of methamphetamine he planned on picking up that day. In response, Francisco FELIX asked
Alejandro MARTINEZ and Augustin RAMIREZ, both of whom were present for the meeting, if
they could locate three pounds of methamphetamine for CRI-2.

74.     In response to this request, Alejandro MARTINEZ made the following intercepted
telephone call to "Manuel" (believed to be Emanuel ARVIZU). ARVIZU is currently on felony
searchable probation for narcotics and, until mid-January, listed 18910 6th Avenue in Stevinson,
California (hereinafter TARGET PROPERTY 14) as his residence.

- Unidentified Female (U/F):  Hello.
- MARTINEZ:  Yes, hello.
- U/F:  Look Gallo, wait. He is outside. I'll, I'll pass him the cell phone right now.
  Wait.
- MARTINEZ:  Okay.
- U/F [Background conversation]: Come. Come. Is Gallo. I already answered.
- ARVIZU:  Hey.
- MARTINEZ:  What's up? What are you doing?
- ARVIZU:  Here . . . Here dude. Doing some mechanic work on Pelon's car.
- MARTINEZ:  Alright. Alright. Hey dude … are there any more of those
  windows - chicken kind?
- ARVIZU:  Yes, dude.
- MARTINEZ:  Where at?
- ARVIZU:  Here in Modesto, dude.
- MARTINEZ:  How much are they? Cheap, dude.
- ARVIZU:  Cheap dude. No, they are not cheap dude. How many do you need?
- MARTINEZ:  Oh. [STUTTERS] Get me three  . . . Three and the money right
  now. Three, the paper.
- ARVIZU:  Do you have the money?
- MARTINEZ:  The paper right now, right now.
- ARVIZU:  How much do you want to pay?
- MARTINEZ:  No. No. Give it to me for cheap!
- ARVIZU:  Well, how much… What's cheap for you dude?
- MARTINEZ:  Well, he… there are some up to three - five hundred.
- ARVIZU:  Okay. Let me, let me call dude. I'll call you later.
- MARTINEZ:  Okay then.

Investigators believe that during this call, Alejandro MARTINEZ and Emanuel ARVIZU
discussed the availability of three pounds of methamphetamine for CRI-2, which Alejandro
referred to as "windows – chicken kind."

75.     After this call ended, CRI-2 asked Alejandro MARTINEZ how long it would be before the methamphetamine was ready.  Alejandro MARTINEZ replied that he was not sure.  CRI-2 then stated that it might be better to wait until Monday (November 10th) to conduct the methamphetamine deal, but they could go ahead with the firearms deal today.  Alejandro MARTINEZ agreed and then retrieved an AR-15 assault rifle, a Russian SKS rifle with a 30 round magazine, an AK-47 assault rifle with a 30 round magazine, and a .50 caliber handgun.  Before Alejandro MARTINEZ retrieved these firearms, CRI-2 asked Alejandro MARTINEZ if it was okay to conduct the firearms deal in front of Augustin RAMIREZ, who was nearby.  Alejandro MARTINEZ replied, "Yeah, he is cool.  He used to cook meth." CRI-2 subsequently purchased these four firearms from Alejandro for $3,700.

76.     While CRI-2 was meeting with Francisco FELIX and Alejandro MARTINEZ, agents observed a blue Dodge truck bearing California license plate 7ASN098 arrive at the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2. A subsequent review of DMV records revealed that this vehicle was registered to Alfonso MAGANA at 557 Traina Court in Patterson, California (hereinafter TARGET PROPERTY 12).  Agents observed an adult male exit the Dodge truck and walk to the back of the residence where he met with Francisco FELIX and CRI-2.  CRI-2 subsequently identified this individual as Alfonso MAGANA, after reviewing MAGANA's California driver's license photograph.

77.     After arriving at the horse ranch properties, MAGANA and Francisco FELIX engaged in a conversation about 80 pounds of marijuana and various quantities of methamphetamine. CRI-2 heard MAGANA tell Francisco FELIX that he sold "10 pounds" earlier, to which Francisco FELIX replied, "Your loaded then."[22] CRI-2 then heard MAGANA and Francisco FELIX talk about some new ranches that Francisco FELIX went to look at earlier that day for the purpose of cultivating marijuana.

78.     A short time later, agents observed MAGANA's Dodge truck leave the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 and travel to TARGET PROPERTY 12.   Agents noticed two other vehicles parked at TARGET PROPERTY 12, both of which were subsequently confirmed to be registered to Alfonso MAGANA, with TARGET PROPERTY 12 listed as the address.

79.     On November 9, 2013, Alejandro MARTINEZ made an intercepted call to 209-380-6754.  The listed subscriber for this telephone number is Gerardo BARRAZA.  209-380-6754 is the same telephone number that Alejandro MARTINEZ was in contact with on August 14, 2013, when CRI-2 purchased two assault rifles from "Gerardo BARAZZA and "Tavo."

80.     During this call, Alejandro MARTINEZ told BARRAZA that "he is coming on Monday," and that to "have him bring them to me tomorrow . . . so as to have them ready just in case he comes early."

---

[22] I believe based on my knowledge of this investigation that MAGANA was referring to 10 pounds of marijuana.

81.     Agents believe that during this call, Alejandro MARTINEZ and BARRAZA discussed the availability and delivery of the three pounds of methamphetamine that CRI-2 was supposed to pick up on Monday, November 10, 2013.

82.     The next day, November 10, 2013, Alejandro MARTINEZ received an incoming call from Gerardo BARRAZA, who was once again using telephone number 209-380-6754. During this call, BARRAZA told Alejandro MARTINEZ that he would be coming by the horse ranch properties to drop something off.  Alejandro MARTINEZ responded that he was not around, and directed BARRAZA to "leave them in the refrigerator, dude, over there in the little room where I have the chairs."

83.     Agents believe that Alejandro MARTINEZ and BARRAZA were talking about BARRAZA dropping off an undisclosed amount of methamphetamine in a refrigerator at the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2.  This belief is based, in part, on a prior controlled purchase of methamphetamine involving CRI-2 and Alejandro MARTINEZ.  During that event, CRI-2 observed Alejandro MARTINEZ retrieve the methamphetamine from a refrigerator located in the barn at the horse ranch properties.

84.     At approximately 5:40 p.m. on November 10, 2013, CRI-2 arrived at the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 and met with Alejandro MARTINEZ.  Alejandro MARTINEZ presented CRI-2 with a kilogram (approximately 2.2 pounds) of methamphetamine, which CRI-2 purchased for $10,000.  During this meeting, Alejandro MARTINEZ told CRI-2 that the friend that Francisco FELIX had been speaking with the other day about cocaine was Francisco FELIX's brother, Miguel FELIX (aka "Mili").

85.     Following this meeting, CRI-2 contacted Alejandro MARTINEZ at the direction of agents and told him that he thought that the methamphetamine was not quite one kilogram.  This spurred a number of intercepted calls between Alejandro MARTINEZ and Gerardo BARRAZA regarding the weight of the methamphetamine purchased by CRI-2.  On November 10th alone, there were 14 intercepted telephone calls between Alejandro MARTINEZ and Gerardo BARRAZA regarding the kilogram of methamphetamine, additional methamphetamine for purchase, and the possibility the kilogram of methamphetamine sold to CRI-2 was less than 1,000 grams.

86.     On November 12, 2013, at approximately 7:45 am, agents, who had previously secured a ping order for two cellular telephones believed to be used by Miguel FELIX, noticed that the phones were "pinging" off a cell tower located near 3941 Northern Oak Drive in Ceres, California (hereinafter, TARGET PROPERTY 11). Agents subsequently responded to this location to conduct surveillance.

87.     After establishing surveillance at TARGET PROPERTY 11, agents observed a red GMC Acadia, California license plate number 6WSR589, registered to Karla SILVA, parked in the driveway of the property. It should be noted that this vehicle had been previously observed at the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 on November 6, 2013. Agents also observed a silver Nissan Maxima, California license plate

number 6EUC299, registered to Sughey FELIX (with a release of liability to Francisco FELIX) parked in the same driveway. Also parked in TARGET PROPERTY 11's driveway was the black Ford F-350 truck that had been observed leaving the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 on July 18, 2013.

88.     At approximately 9:16 am, agents observed Miguel FELIX exit the front door of TARGET PROPERTY 11 and walk toward the black Ford F-350 truck while using his cell phone. SA Olivera subsequently contacted a MAVMIT analyst who confirmed through pen register analysis that Miguel FELIX had sent text messages from his cell phone between 9:14 am and 9:18 am.

89.     On November 12, 2013, SA Scott Bryan (MAVMIT) observed Alfonso MAGANA walk out of the front door of the residence at TARGET PROPERTY 12, smoke a cigarette on the front porch, and then reenter the residence.

90.     Also on November 12, 2013, agents observed a black Nissan Altima, with California license plate number 6SLW190, arrive at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2. According to DMV records, this vehicle is registered to Daisy MEDINA at 2104 Manhattan Way in Modesto, California (hereinafter TARGET PROPERTY 13).

91.     At approximately 11:05 am, the Nissan Altima, with Alejandro MARTINEZ and two other adult male occupants inside, drove from the horse ranch properties to a flea market in Turlock, California. Approximately one hour later, the three men returned to the Nissan Altima and drove back to the horse ranch properties. One of the occupants inside the vehicle was subsequently identified as Jesus NUNEZ-FELIX (a.k.a. "Chuito").

92.     After they arrived, Alejandro MARTINEZ and the two other men exited the vehicle and walked toward the barn structure situated between TARGET PROPERTY 1 and TARGET PROPERTY 2. Moments later, agents observed the two adult males return to the Nissan Altima and drive away. Agents followed the Altima to TARGET PROPERTY 13 where it parked on the driveway. Agents observed the two men exit the car and enter the residence located at TARGET PROPERTY 13.

93.     A short time later, agents observed a dark colored SUV pull out of the garage at TARGET PROPERTY 13 and drive to Bertolotti Transfer Station located at 231 Flamingo Drive in Modesto, California. Once at this location, agents observed an unidentified adult male remove 11 large black garbage bags out of the back of the SUV which he then left at the transfer station.

94.     After the SUV drove away from the transfer station, agents recovered the eleven large black garbage bags dumped by the SUV driver, and examined their contents. The bags contained marijuana plant root balls, stems, marijuana plant clippings, foam grow cubes with stalks and root balls, fertilizer, oven bag boxes, receipts, and rubber gloves. All of these items were consistent with items commonly used for the indoor cultivation of marijuana.

95.    On November 14, 2013, at approximately 6:03 pm, agents intercepted a telephone call made by Alfonso MAGANA from telephone number 209-872-9797 to Francisco FELIX.[23] The listed subscriber for this telephone number is Adriana Magana at TARGET PROPERTY 12. During the call, Alfonso MAGANA asked FELIX, "Did you get anything." FELIX replied, "Nothing, nothing. No way man, it's all dry, fuck." FELIX then stated that "it's tough," and asked, "You haven't gotten any out?" Alfonso MAGANA replied, "Some, two, three, four, but not much." FELIX commented, "At least for something, right?" Alfonso MAGANA then told FELIX about an individual who "works in ranches" and can get "chemicals." FELIX asked, "What kind of chemicals does he have?" Alfonso MAGANA replied that he didn't know, but that the guy had called him because he knew about somebody that had some from "the inside" if MAGANA was interested.

96.    Agents believe that during this call Francisco FELIX and Alfonso MAGANA were discussing the availability of narcotics. When Francisco FELIX replied that it was "all dry," agents believe that Francisco FELIX was telling Alfonso MAGANA that narcotics were scarce. Moreover, when Francisco FELIX asked Alfonso MAGANA if he had "gotten any out," and Alfonso MAGANA replied "two, three, four," agents believe that Alfonso MAGANA was telling Francisco FELIX that he had only sold somewhere between two and four units of an unspecified narcotic. Finally, agents believe that when Francisco FELIX asked about the "kind of chemicals" Alfonso MAGANA's contact could provide, Francisco FELIX was trying to determine whether they were chemicals that could be used in the cultivation of marijuana (such as fertilizers) or chemicals that could be used in the production of methamphetamine. Finally, when Alfonso MAGANA indicated that the individual knew someone that had some from "the inside," agents believe that Alfonso MAGANA was telling Francisco FELIX that the individual knew someone that had marijuana that had been cultivated indoors.

97.    Also on November 14, 2013, agents observed a gold sedan bearing Baja California license plate AKL8324 travel from the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 to TARGET PROPERTY 6 where the driver was observed parking under the carport and closing the gate behind him. This vehicle has been seen at TARGET PROPERTY 6 throughout this investigation. Moreover, queries of HSI databases indicate that this same vehicle crossed into the United States from Mexico nine times between January 2013 and April 2013. And records indicate that in April 2013, CPB received an anonymous phone call indicating that the vehicle was possibly laden with narcotics.

98.    On November 15, 2013, at approximately 12:33 pm, agents intercepted an incoming call from Miguel FELIX to Francisco FELIX regarding possible law enforcement surveillance of TARGET PROPERTY 1 and TARGET PROPERTY 2. During the call, Miguel FELIX said that he had talked to "Manuelito" who told him that "his brother-in-law, the one that waters" told him that there were "guys looking toward the ranch."

---

[23] During the period of the wire, agents intercepted approximately 23 pertinent phone calls between Alejandro MARTINEZ, Francisco FELIX, and Alfonso MAGANA regarding the cultivation, transportation, and sales of controlled substances. During each of these calls, MAGANA was using telephone number 209-872-9797.

99.     At approximately 1:09 pm, Francisco FELIX placed an outgoing call to Alfonso MAGANA at 209-872-9797. During the call, Francisco FELIX asked MAGANA for "Andy's number, the one that waters over there." MAGANA corrected Francisco FELIX that the man's name was "Randy," and said that he had "the company's phone number, the water company." Francisco FELIX asked MAGANA to call Randy and have Randy call him back.

100.     At approximately 1:17 pm, Francisco FELIX received an incoming call from Randy CARRILLO, who works at the Patterson Water District office located at 948 Orange Avenue in Patterson, California. During the call, Francisco FELIX told Randy CARRILLO, "Listen they called me, they told me that, that you had seen something there close by." Randy CARRILLO responded, "I don't know, but they have been here two weeks, here parking with us man." Randy CARRILLO continued, "They park there and they leave and come back." Francisco FELIX responded, "I thought that you had seen them on my street. Over there with 'El Gallo.'" Randy CARRILLO responded, "No, I don't know. Yesterday a truck went by and they followed over that way. But I don't know." Randy CARRILLO went on to tell Francisco FELIX that he had observed two four-door grey Dodge trucks, a brown Tahoe, and a white Trailblazer parked at "the office," and that the individuals driving the vehicles looked "like junkies." Francisco FELIX ended the call by instructing Randy CARRILLO to "send me some information like that, if you see them around there, take a picture of them and send it to me."

101.     During surveillance operations of the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2, surveillance units staged their vehicles in the Patterson Water District's parking lot. After intercepting this telephone call, law enforcement agents were able to associate telephone number 209-622-7466 to Randy CARRILLO through checks of CP Clear, a database of public information. After viewing Randy CARRILLO's California driver's license photograph, law enforcement agents who had previously staged their vehicles in the Water District parking lot confirmed that they had observed Randy CARRILLO at the Patterson Water District office in the past.

102.     Between November 16, 2013, and November 20, 2013, investigative agents intercepted numerous telephone calls made to and from Francisco FELIX and Alejandro MARTINEZ regarding the acquisition of 50 pounds of methamphetamine.

103.     On November 16, 2013, Francisco FELIX and CRI-2 engaged in a telephone conversation about the 50 pounds of methamphetamine and multiple kilograms of cocaine ("blond girls") that CRI-2 had previously agreed to transport "back east" for Miguel FELIX.

- Francisco FELIX: What's up boss?
- CRI-2: Right here, checking-in, boss. What's going on with the… [U/I].
- Francisco FELIX: That's good. Where… where are you?
- CRI-2: Entering California already.
- Francisco FELIX: Oh, that's good. That's good.
- CRI-2: What's to do?
- Francisco FELIX: Well, let… let me call the guy because we are looking into how to do it on when he can find it.
- CRI-2: [U/I]

- Francisco FELIX: To take it up there.
- CRI-2: Okay.
- Francisco FELIX: I will call you shortly. Let me call my... brother there.
- CRI-2: Okay. And the... And then I was going to ask you about the girls... the blonde girls from your friend. They don't want a ride?
- Francisco FELIX: Oh no, yes. I think he is going to need one (1) of those or something like that. But let me... let me call him, with him [U/I] right now.
- CRI-2: Okay. That's good. Alright.
- Francisco FELIX: Alright. Alright then.
- CRI-2: [U/I]
- Francisco FELIX: Alright, bye.

Investigators believe that when Francisco FELIX told CRI-2 that he was trying to contact the guy who knows "how to do it" and "when [to] find it," Francisco FELIX was referring to his source of supply for the 50 pounds of methamphetamine. Moreover, investigators believe that when CRI-2 asked Francisco FELIX about the "blond girls" that needed a "ride," this was in reference to a load of cocaine that Francisco FELIX had previously asked CRI-2 to transport on behalf of Miguel FELIX (aka "Mili").

104.   That same day, Alejandro MARTINEZ received a telephone call from "Manuel" (believed to be Emanuel ARVIZU), who was using telephone number 818-693-3193.

- ARVIZU [Background conversation]: ...that they are... they are giving it for four nine
- MARTINEZ: Hey.
- ARVIZU: Why aren't you fucking answering?
- MARTINEZ: I'm here taking a look at a colt dude.
- ARVIZU: Uh?
- MARTINEZ: I'm here [U/I] taking a look at a colt, I'm getting it.
- ARVIZU: Alright. What was I going to tell you dude? Tell your buddy that I got him some of those.
- MARTINEZ: Okay. Yeah, okay. Umm.
- ARVIZU: And how many he wants?
- MARTINEZ: Where are they?
- ARVIZU: Here in Los Angeles.
- MARTINEZ: Oh. You're there right now?
- ARVIZU: Yeah.
- MARTINEZ: Okay. Well, let me call him.
- ARVIZU: But, how many do you think he will take, more or less?
- MARTINEZ: Well, I don't know dude. I'll tell him right now [U/I].
- ARVIZU: Call him right now and then call me.
- MARTINEZ: Okay.
- ARVIZU: Hey...
- MARTINEZ: Okay.
- ARVIZU: Ask him if he wants kilos or pounds.

- MARTINEZ: Okay. I'll ask him.
- ARVIZU: Okay. Call me later.
- MARTINEZ: [U/I] Bye

Investigators believe that during this call Alejandro MARTINEZ and Emmanuel ARVIZU discussed the availability of narcotics, presumably methamphetamine, for CRI-2. Investigators believe that the "buddy" to which ARVIZU referred to was CRI-2, and that ARVIZU needed to confirm with MARTINEZ whether CRI-2 wanted the methamphetamine packaged in "kilos or pound" quantities.

105.   After this intercepted call, Alejandro MARTINEZ called CRI-2, at Francisco FELIX's direction, and told him that the 50 pounds of methamphetamine was ready. Alejandro then directed CRI-2 to go to the Los Angeles, California, area, where the methamphetamine was located.

106.   On November 17, 2013, Francisco FELIX received an incoming call from Dana SASSENBERG at 415-420-9655. During the call, SASSENBERG told Francisco FELIX that he was in "Tahoe wait[ing] for them to dry," and stated that "they were cutting them, so I have to wait." Francisco FELIX asked SASSENBERG, "Yeah, how they turned? They turned good?" SASSENBERG responded, "Fucking outdoor! They came out good! I just wish I would have done more and done it sooner!" As the conversation continued, Francisco FELIX asked SASSENBERG if he could "give me something right now? I mean . . . or to put it in the Western Union, whatever?" SASSENBERG responded that he would work on it.

107.   Agents believe that during this call Francisco FELIX and Dana SASSENBERG were discussing the processing of marijuana somewhere near Lake Tahoe. When Francisco FELIX asked if they "turned good," agents believe that he was asking SASSENBERG if the marijuana was of high quality. In response, SASSENBERG indicated that he was pleased with the yield and quality. Agents also believe that when Francisco FELIX asked SASSENBERG to "to put it in the Western Union," Francisco FELIX was asking SASSENBERG to transfer or send some of the marijuana proceeds to him.

108.   On November 19, 2013, law enforcement agents traveled with CRI-2 to Ontario, California, in anticipation of picking up 50 pounds of methamphetamine for delivery to Chicago, as well as up to ten kilograms of cocaine. After arriving in Ontario, CRI-2 contacted Alejandro MARTINEZ. During CRI-2's call with Alejandro MARTINEZ, Francisco FELIX got on MARTINEZ's phone and told CRI-2 that the 50 pounds of methamphetamine was "no good," it had "too much cut in it," and they did not want to send it Chicago because the group in Chicago would never do business with them again if they received the poor quality methamphetamine.

109.   Alejandro MARTINEZ was subsequently intercepted making several calls that day to other suspected sources of supply in an apparent, and ultimately unsuccessful, attempt to locate 50 pounds of methamphetamine. The following is one of the intercepted calls that Alejandro MARTINEZ made to "Manuel" (believed to be Emanuel ARVIZU).

- ARVIZU: Hey!

27

- MARTINEZ:  What's up? What are you doing?
- ARVIZU:  What? Here at home.
- MARTINEZ:  Alright, alright. That's fine.
- ARVIZU:  Yeah.
- MARTINEZ:  Hey dude, the... the... the other thing over there in Los Angeles, the other thing, Where... where is it?
- ARVIZU:  Which one?
- MARTINEZ:  The other things.
- ARVIZU:  In Fontana.
- MARTINEZ:  In Fontana?
- ARVIZU:  Uh-huh.
- MARTINEZ:  Alright, alright. My buddy was there, dude. And he was going to see it.
- ARVIZU:  Uh?
- MARTINEZ:  My buddy is there right now.
- ARVIZU:  In Los Angeles?
- MARTINEZ:  Yes.
- ARVIZU:  Alright. It is in Fontana, dude.
- MARTINEZ:  Well, he is in Ontario.
- ARVIZU:  Oh, he is very close, dude.
- MARTINEZ:  Let's... let's see what he tells me. What's up?
- ARVIZU:  Yes. My father-in-law also has for the trailers, dude.
- MARTINEZ:  What?
- ARVIZU:  My father-in-law, you see, has a garage. If he wants to go see it, he can put the trailer in there [U/I].
- MARTINEZ:  There at [U/I]... Can they bring it to you there... so he can see it?
- ARVIZU:  Hey!
- MARTINEZ:  No, I'm saying that if they can bring it over there... at your father-in-law.
- ARVIZU:  Right there with my father-in-law? Yes, dude.
- MARTINEZ:  Yes? Uh, I will tell him and see what's up. [U/I] go over there
- ARVIZU:  Alright.
- MARTINEZ:  What did the fat guys tell you, dude, because another customer might take it, dude.
- ARVIZU:  No, no, no. They did not answer to me, dude. I will call them right now, dude.
- MARTINEZ:  Call them, dude, otherwise to bring it over. [U/I]
- ARVIZU:  Alright dude.
- MARTINEZ:  Alright then.
- ARVIZU:  Alright [U/I]. Hey dude.
- MARTINEZ:  Hey.
- ARVIZU:  Do you want me to tell them to move that thing?
- MARTINEZ:  Wait... wait for me to call him first.
- ARVIZU:  Call him and you call me right away.

• MARTINEZ:  Alright then.

Investigators believe that during this call, Alejandro MARTINEZ and Emanuel ARVIZU
discussed the availability of 50 pounds of methamphetamine for CRI-2.  This belief is further
supported by the fact that while this call was taking place, CRI-2 was in Ontario awaiting
delivery of 50 pounds of methamphetamine from the FELIX DTO.

110.  Later that day, after an unsuccessful attempt to contact Emanuel ARVIZU,
Alejandro MARTINEZ informed CRI-2 that they would need more time to connect with their
sources to secure the 50 pounds of methamphetamine.

111.  On November 26, 2013, at approximately 8:59 am, Francisco FELIX contacted
Miguel FELIX at 209-303-0318.  During the call, Francisco FELIX told Miguel FELIX that he
was "struggling" because he "thought they were over there, but they didn't" and asked Miguel
FELIX if his buddy "will let some go."   Miguel FELIX replied that the guy "had some real good
ones of the kind you need" and would see if he could obtain them for Francisco FELIX.  Agents
believe that Miguel FELIX and Francisco FELIX were discussing the availability of
methamphetamine for CRI-2 to pickup.  Agents believe that at this time Francisco FELIX was
having trouble locating the methamphetamine that he wanted CRI-2 to transport to Chicago, and
was seeing if Miguel FELIX had any alternative sources that would "let them go."

112.  At approximately 9:16 am, CRI-2 contacted Francisco FELIX to see what time the
methamphetamine would be ready for pickup.  Francisco FELIX said that "the buddy didn't,
didn't cross yesterday and he barely called me that he would have that this afternoon."  Agents
believe that Francisco FELIX was telling CRI-2 that the methamphetamine had not yet made it
across the border from Mexico into the United States, and that he was told that it would be
arriving later in the day.

113.  At approximately 12:53 pm, Francisco FELIX contacted Miguel FELIX at 209-
303-0318 to inquire about whether Miguel FELIX's source of supply had any methamphetamine
available.  Francisco FELIX said, "I only got twenty five and I wanted to see if, if you had gotten
some to send them up there."  Agents believe that Francisco FELIX had located 25 pounds of
methamphetamine for CRI-2 to pick up, but wanted to send a larger load with CRI-2 and was
checking with Miguel FELIX to see if he had found any additional methamphetamine.

114.  At approximately 3:30 pm, CRI-2 contacted Francisco FELIX to get an update
regarding the planned methamphetamine pick up.  Francisco FELIX said that "they only have
twenty two" because "they're having a hard time crossing them."  Francisco FELIX then stated,
"From here on out, well, all the ones they cross will be for us."  Agents believe that Francisco
FELIX was telling CRI-2 that he had secured 22 pounds of methamphetamine for CRI-2 and was
hoping to have had more, but the organization was having difficulty smuggling the
methamphetamine across the border from Mexico.

115.  At approximately 6:14 pm, an unidentified male (later identified as Martin
LOPEZ) called Francisco FELIX from telephone number 626-353-6495.  During the call,
Francisco FELIX stated, "I didn't know that it was you I was going to meet."  Martin LOPEZ

responded, "The people haven't arrived yet," and continued that he would call Francisco FELIX in a little while. Francisco FELIX said, "Have me as much as you can, okay, because things are going to get real good here." Based on their review of this call and their knowledge of this investigation, agents believe that Francisco FELIX had obtained narcotics from Martin LOPEZ in the past, and that Francisco FELIX was asking Martin LOPEZ to try and locate as much methamphetamine as possible for CRI-2 to pick up.

116.    At approximately 8:24 pm, Martin LOPEZ called Francisco FELIX again from telephone number 626-353-6495. During the call, Martin LOPEZ told Francisco FELIX, "I'll meet you at, where we had met before...close to the hotel." Francisco FELIX responded that he would have his "trustworthy" buddy meet with Martin LOPEZ, and that he would have his buddy contact Martin LOPEZ for directions. Martin LOPEZ then told Francisco FELIX that "there are 23." Agents believe that when Francisco FELIX was referring to his "trustworthy" buddy, he was referring to CRI-2 who would be picking up the methamphetamine from Martin LOPEZ.

117.    At approximately 8:26 pm, FELIX contacted CRI-2 and provided CRI-2 with phone number 626-353-6495, stating that it was his "cousin's" number. Francisco FELIX instructed CRI-2 to "tell him you are calling on Paco's behalf, and he will give you the address so you can go over there. He said he was able to find me only 23 calves." Based on their review of this call and their knowledge of this investigation, agents believe that Francisco FELIX was directing CRI-2 to meet with Martin LOPEZ so that CRI-2 could obtain 23 pounds of methamphetamine from him.

118.    At approximately 8:27 pm, CRI-2 contacted Martin LOPEZ at 626-353-6495, and Martin LOPEZ gave CRI-2 directions to where they would meet in Rosemead, California.

119.    At approximately 8:42 pm, Francisco FELIX contacted Martin LOPEZ and said that he has "a good job over there" and that he would give Martin LOPEZ "one hundred bucks for the calves that they are going to sell me." Francisco FELIX asked Martin LOPEZ to get him "50 calves because that's what will fit in the trailer to go up there" and "to have them ready for me next week." Martin LOPEZ then told Francisco FELIX that his "buddy" had contacted him and was coming. Based on their review of this call and their knowledge of this investigation, agents believe that Francisco FELIX was asking Martin LOPEZ to have 50 pounds of methamphetamine ready for CRI-2 to pick-up the following week.

120.    At approximately 9:21 pm, agents observed CRI-2 meeting with Martin LOPEZ on the sidewalk in front of a hotel on Glendon Road in Rosemead, California. After a brief meeting, Martin LOPEZ placed a box into the back of CRI-2's vehicle. The box was later found to contain approximately 23 pounds of methamphetamine.

121.    On November 27, 2013, at approximately 7:11 pm, agents intercepted a telephone call made by Josefina DELGADO-FELIX from telephone number 209-221-1473 to Francisco FELIX. The listed subscriber for this telephone number is Josefina DELGADO-FELIX at 1034 Fishback Road in Manteca, California. During the call, Josefina DELGADO-FELIX told Francisco FELIX that "the kids were anxious and saying, 'Mom, when are they coming to pick

us up?'" Francisco FELIX responded, "So I said 'I can come to pick up Javi, but it didn't work that way. And then he talked, he talked to Leandro so I thought that they had agreed something." Josefina DELGADO-FELIX responded, "No, I was under the impression that they would get picked up from over there. I told you that Henry would come to spend the night at Jesusin." Francisco FELIX said that he thought that it had been all worked out for "Chuito" to pick them up. Josefina DELGADO-FELIX indicated that "He [Chuito] came to get Javi."

122.   During the above referenced call between Josefina DELGADO-FELIX and Francisco FELIX, agents believe that Josefina DELGADO-FELIX inquired about why her sons had not been picked up to trim marijuana for the FELIX DTO. Josefina DELGADO-FELIX and her sons Javier (a.k.a. "Javi") and Henry are believed to be involved in the marijuana operations of the FELIX DTO.

123.   At approximately 7:39 pm, agents intercepted a telephone call from "Chuito" at 209-221-2473 to Francisco FELIX. The listed subscriber for 209-221-2473 is Jesus NUNEZ at TARGET PROPERTY 8. Throughout the call, Chuito referred to Francisco FELIX as "uncle." Chuito told Francisco FELIX that they completed "two rooms." Francisco FELIX asked, "How many hangers came out?" Chuito responded, "Javi and I made, uh, eleven and a half." The conversation continued about accounting for how many "hangers" were left and letting Francisco FELIX know so that he could make sure that nobody tried to steal some.

124.   During the wire intercept, agents intercepted no less than six telephone calls between Leonaires ALCAUTER and Francisco FELIX dealing with marijuana trafficking. Each time, Leonaires ALCAUTER has called from telephone number 510-867-4568.

125.   In response to this call activity, agents secured a ping order for Leonaires ALCAUTER's cellular telephone number (510-867-4568) . The ping data for this telephone subsequently revealed that the phone was consistently located in the vicinity of 2207 Orange Avenue in Patterson, California (hereinafter TARGET PROPERTY 15). Furthermore it was noted that ALCAUTER's cell phone was at 2207 Orange Avenue for extended periods of time and during late night and early morning hours. Agents know through DMV records that Leonaires ALCAUTER currently owns a 2001 Ford registered to him at TARGET PROPERTY 15. Furthermore, agents know through Parcel Quest checks that TARGET PROPERTY 15 is currently owned by Leonaires ALCAUTER.

126.   On December 2, 2013, agents intercepted a telephone call from Leonires ALCAUTER at 510-867-4568 to Francisco FELIX. Leonires ALCAUTER asked if Francisco FELIX had any "bills," to which Francisco FELIX responded that he had "lots of grass right now." Leonires ALCAUTER asked, "There is no money, nothing?" Francisco FELIX responded that he had not "gotten any of the bales out of the mud." Francisco FELIX then told ALCAUTER that he did not have "anybody to deliver the grass," and continued that he would bring the grass over for Leonires ALCAUTER to look at because he "know[s] more." They agreed to meet the following morning at around 9:30 am.

127.   Agents believe that during this call, Leonires ALCAUTER was asking to be paid for money that Francisco FELIX owed him. During previously intercepted telephone calls,

Francisco FELIX was heard requesting money from Leonires ALCAUTER. When Francisco FELIX said that he had "grass" to show to Leonires ALCAUTER because he "know[s] more," agents believe that Francisco FELIX was offering to bring Leonires ALCAUTER marijuana to show him, and that Francisco FELIX was hoping that Leonires ALCAUTER could help him find a buyer so that he could pay Leonires ALCAUTER the money that he owed him.

128.    On December 3, 2013, agents established surveillance at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2. At approximately 8:18 am, agents observed a black Nissan Altima matching the description of Francisco FELIX's vehicle arrive at the horse ranch properties. Location data for Francisco FELIX's cell phone and intercepted calls indicated that Francisco FELIX was in the black Nissan Maxima at the time.

129.    At approximately 8:59 am, agents intercepted a telephone call from Francisco FELIX to Leonaires ALCAUTER at 510-867-4568. During this telephone call, Leonaires ALCAUTER told Francisco FELIX that he would be home in one to one and a half hours.

130.    Approximately one and a half hours later, agents observed the black Nissan Maxima depart the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 and drive to Leonaires ALCAUTER residence at TARGET PROPERTY 15. Location data for Francisco FELIX's cell phone at the time showed the phone was at TARGET PROPERTY 15.

131.    From December 3 through December 9, 2013, Francisco FELIX and CRI-2 exchanged text messages using Whatsapp to discuss the delivery of US currency and the subsequent pickup of 42 pounds of methamphetamine from Martin LOPEZ. The messages also covered Francisco FELIX providing direction to CRI-2 to meet with his brother, Miguel FELIX to give him $5,000 for arranging the pickup of an additional 25 pounds of methamphetamine.

132.    During the 60-day period of the wire, agents intercepted approximately 35 phone calls made between Alejandro MARTINEZ and Rafael ALCAUTER. Based on their review of these telephone calls and their training and experience, agents believe that Alejandro MARTINEZ and Rafael ALCAUTER used these calls to discuss the cultivation, transportation, and sales of marijuana.

133.    On December 4, 2013, surveillance was established in the area of 1215 Golden Eye Court in Newman, California (hereinafter TARGET PROPERTY 16). Utilities for TARGET PROPERTY 16 are in the name of Veronica Alcauter, and have been since December 15, 2008. Agents identified three vehicles in the driveway of TARGET PROPERTY 16 that returned to Rafael ALCAUTER. At approximately 7:41 am, agents observed Rafael ALCAUTER exit the residence and get into the driver's seat of a white GMC van which is also registered to him at TARGET PROPERTY 16. Agents then observed Rafael ALCAUTER drive from TARGET PROPERTY 16 to 27207 State Hwy 33 in Newman, California (hereinafter TARGET PROPERTY 17). Property records for TARGET PROPERTY 17 show that Rafael ALCAUTER owns this property. Utilities for TARGET PROPERTY 17 are in the name of Rafael ALCAUTER and Veronica Alcauter, and have been since January 25, 2006.

134.   During the 60-day period of the wire, agents intercepted approximately 28 phone calls made between Martin RUBIO to either Alejandro MARTINEZ or Francisco FELIX. Based on their review of these telephone calls and their training and experience, agents believe that during these phone calls Martin RUBIO spoke about the cultivation, transportation, and sales of controlled substances.

135.   On December 4, 2013, at approximately 8:22 am, agents intercepted the following telephone call between Martin RUBIO and Francisco FELIX:

- Francisco FELIX:  What's up [U/I]?
- RUBIO: What's up, Paco? I tried calling you last night. [VOICES OVERLAP]
- Francisco FELIX: Where are you?
- RUBIO: [U/I], Here at the house.
- Francisco FELIX: Okay. What's up? You already [U/I]?
- RUBIO: Uh?
- Francisco FELIX: You already went to the ranch?
- RUBIO: Yes, I was calling you last night to go and you did not answer.
- Francisco FELIX: Ay! I was there… I was there with El Gordo last night.
- RUBIO: Really?
- Francisco FELIX: Yes… and I said, "This fucker said to take it to him and I took it to him."
- RUBIO: Well yes, but… Since I was talking to the guy and he said, 'Tomorrow, tomorrow," he told me, right?
- Francisco FELIX: And what did he tell your right now? To show him one or what?
- RUBIO: Yes. He told me… [VOICES OVERLAP]
- Francisco FELIX: Ah well, right away and see … Come over there… [U/I] see if you can sell something because I am broke, dude.
- RUBIO: Ey, no, I'm also broke. What was I going to tell you? Let… let me call him and tell him to be ready, right? Where… where is it? Where?
- Francisco FELIX: Over there, at Gallo.
- RUBIO: At Gallo? Okay, alright then.
- FRANCISCO: [U/I]. Alright then. Bye.

Investigators believe that during this call, Martin RUBIO and Francisco FELIX discussed picking up marijuana at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2.

136.   At approximately 10:08 am, agents observed a green compact car at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2.  During this time period, agents intercepted phone calls between Martin RUBIO and both Francisco FELIX and Alejandro MARTINEZ that indicated that RUBIO had arrived at the adjoining horse ranch properties to pick up marijuana.

137.   At approximately 10:09 am, agents intercepted the following phone call between Martin RUBIO and Alejandro MARTINEZ:

- RUBIO: Gallo!
- MARTINEZ: Hey.
- RUBIO: Hey, Paco sent me over . . . I'm here by the horses.
- MARTINEZ: Oh. We are here, we are here. I'm over here at the other house. [VOICES OVERLAP] . . . Over here at the other yellow house.
- RUBIO: Oh, because I'm in a hurry and I'm here.
- MARTINEZ: What do you need?
- RUBIO: Well, I came to pick up something.
- MARTINEZ: Excuse me?
- RUBIO: I came to pick up something.
- MARTINEZ: What?
- RUBIO: Grass, you know.
- MARTINEZ: Excuse me?
- RUBIO: Of that, well of that grass.
- MARTINEZ: Alright, alright. That's it, I'm on my way there.
- RUBIO: Hurry up, please.

138.   At approximately 10:11 am, agents intercepted the following phone call between Francisco FELIX, Martin RUBIO and Alejandro MARTINEZ:

- RUBIO: Hey.
- Francisco FELIX: Hey, put Gallo on.
- RUBIO: [ASIDE: Paco]
- MARTINEZ: Hey!
- Francisco FELIX: Hey, what's up, Gallo?
- MARTINEZ: Nothing, nothing. Which one you want me to give to him?
- Francisco FELIX: Hey, right there… Right there at the yellow house…
- MARTINEZ: Ey.
- Francisco FELIX: Right there at the garage… Instead of going inside where the babies are…
- MARTINEZ: Uh-huh.
- Francisco FELIX: You go towards… the right, and right at the corner, up where the tables are, a white table, right there I have the one that came out from Adrian.
- MARTINEZ: Okay.
- Francisco FELIX: Give him … give him one of the ones from Adrian.
- MARTINEZ: Okay. Alright then.
- Francisco FELIX: Alright then.

Investigators believe that during this call, Francisco FELIX directed Alejandro MARTINEZ to give Martin RUBIO marijuana that had been obtained from "Adrian." Furthermore, agents believe that there is an indoor marijuana cultivation area inside the residence at TARGET

34

PROPERTY 2, and that the "babies" are reference to small marijuana plants (starters) that are being grown there.

139.    During an intercepted call at approximately 10:18 am, Martin RUBIO asked Francisco FELIX if he could "take three...to try selling it." Francisco FELIX responded, "Take it! Take it! You know what you [are] doing." Francisco FELIX then told Martin RUBIO to "try hard to sell something because I don't have any money and I'm going to Mexico later today." Based on their review of this call and their knowledge of this investigation, agents believe that Francisco FELIX authorized Martin RUBIO to take three pounds of marijuana to sell.

140.    At approximately 10:30 am, agents observed the same a green compact car (subsequently identified as a Dodge Dart) with paper plates depart TARGET PROPERTY 2 and drive to a shopping center, where it stopped to pick-up an adult female. The Dodge Dart then drove to a parking lot where it parked close to a silver van. Agents observed one male subject from the Dodge Dart walk across the street as an apparent lookout. The female occupant of the car was then observed meeting with an adult male from the silver van and handing the subject something. The driver of the van was then observed pulling a blue igloo ice chest from the middle seat area and then moving it to the rear compartment area of the van.

141.    After the meet, Agents continued following the Dodge Dart until the CHP initiated a traffic stop on the vehicle. During the traffic stop, Martin RUBIO was identified as the driver of the vehicle. Law enforcement was subsequently able to identify RUBIO's address as 1840 Fort Hall Place in Stockton, California (hereinafter TARGET PROPERTY 18).

142.    On December 4, 2013, at approximately 1:12 pm, agents intercepted a telephone call between Alejandro MARTINEZ and Rafael ALCAUTER. During the phone call, Rafael ALCAUTER said that he was "looking for the 'Kush,'" continuing that "some men will arrive who want about, around ten of the Diesel." Alejandro MARTINEZ responded that he had product and that Rafael ALCAUTER could "come and see these and let's see how it works out." They agreed to meet the following morning. Based on their review of this call and their knowledge of this investigation, agents believe that during this call, Alejandro MARTINEZ and Rafael ALCAUTER discussed strains of marijuana, specifically strains called "OG Kush" and "Sour Diesel," that Rafael ALCAUTER was looking to acquire (10 pounds worth) to sell to some unidentified buyers.

143.    On December 5, 2013, at approximately 8:19 am, agents observed Rafael ALCAUTER drive from TARGET PROPERTY 16 to TARGET PROPERTY 17. While at TARGET PROPERTY 17, Rafael ALCAUTER was seen accessing the entire property and going in and out of the main residence. Agents later surveilled Rafael ALCAUTER from TARGET PROPERTY 17 to the Bank of America located at 208 5th Street in Gustine, California. SA Steve Weinstock (MAVMIT) followed Rafael ALCAUTER into the bank. Agents placed a phone call to Rafael ALCAUTER'S cell phone (510-385-1463), and SA Weinstock observed Rafael ALCAUTER answer the phone call placed by agents.

144.    At 10:20 am, Rafael ALCAUTER drove to the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2, and parked in front of the

gate. At approximately 10:21am and 10:23am, agents intercepted two attempted phone calls from Rafael ALCAUTER to Alejandro MARTINEZ which did not connect.

145. At approximately 10:25 am, agents observed Rafael ALCAUTER leave the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 and drive to TARGET PROPERTY 4 (Francisco FELIX's secondary residence). At approximately 10:37 am, agents intercepted a phone call between Alejandro MARTINEZ and Rafael ALCAUTER (510-385-1463). Rafael ALCAUTER told Alejandro MARTINEZ that he was there and waited for him, but he didn't come out so he left. Rafael ALCAUTER told Alejandro MARTINEZ that he would be heading back to get that "job."

146. At approximately 12:00 pm, agents observed Rafael ALCAUTER arrive back at TARGET PROPERTY 2, where he met with a subject wearing an orange shirt. After the meet, Rafael ALCAUTER left the residence. Agents followed Rafael ALCAUTER back to TARGET PROPERTY 17. Once at TARGET PROPERTY 17, Rafael ALCAUTER parked behind the residence and retrieved mail from the mailbox.

147. On December 5, 2013, agents conducted a drive by of TARGET PROPERTY 18, and observed two vehicles registered to Martin RUBIO parked at the residence.

148. On December 7, 2013, agents intercepted a telephone call between Alejandro MARTINEZ and "Sergio" (believed to be Sergio MODESTO). MODESTO asked MARTINEZ if he still wanted "that," and said that he would have them delivered by Tuesday. Sergio said that they needed at least half the money before he will give any product and that the price would be "five, five hundred at the most." Alejandro MARTINEZ responded that that was very expensive, and asked MODESTO if he could get the price down. During a subsequent call on December 8, 2013, MODESTO told Alejandro MARTINEZ that the price was still "five, five hundred," and that they needed to pay "at least five" upfront. Based on their review of this call and their knowledge of this investigation, agents believe that Alejandro MARTINEZ and MODESTO were talking about getting methamphetamine which Alejandro MARTINEZ intended to give to CRI-2 to take to buyers in Chicago, Illinois. Agents further believe that MODESTO's source of supply agreed to sell the methamphetamine to him at $5,500 per pound, but they would need to pay $5,000 upfront.

149. On December 8, 2013, agents intercepted a telephone call between CRI-2 and Alejandro MARTINEZ regarding the acquisition and movement of methamphetamine out to Chicago, Illinois. During this call, CRI-2 asked Alejandro MARTINEZ, "How are we going to work out what you had told me about before . . . the thing is that I am, I am interested, but there isn't going to be uh, there isn't going to be any paper. All the paper that, that I have right now, that guy told me to leave it there with, with his cousin in Los Angelitos." Alejandro MARTINEZ responded that "they don't need much . . . about, about five." CRI-2 asked Alejandro MARTINEZ if they knew "that it's not until I return, right?" Alejandro MARTINEZ responded, "Yeah. I already, already talked to him. Well, I already accounted for it with some things over there in Mexico and all . . . we already came to an agreement." Alejandro MARTINEZ continued, "Well the guy reassured me, me that they are at one hundred percent, that they are good."

150.    Based on their review of this call and their knowledge of this investigation, agents believe that during this call Alejandro MARTINEZ explained to CRI-2 that he had made arrangements for CRI-2 to transport ten pounds of methamphetamine to Chicago, and that they would only have to come up with $5,000 to get the methamphetamine released to them for the trip.

151.    During an intercepted call on December 9, 2013, CRI-2 told Alejandro MARTINEZ that he was in Los Angeles and had the "5 papers." Alejandro MARTINEZ responded that he was going to talk to his buddy to "organize everything" and would call CRI-2 back.

152.    During a call intercepted later that day, Alejandro MARTINEZ told CRI-2 that they sent the "hens" and that he would hold them there with him. CRI-2 asked Alejandro MARTINEZ how much they cost him. Alejandro MARTINEZ responded that the price was "four fifty," and that they would lower the price later. CRI-2 then asked if it would still be "ten girls." Alejandro MARTINEZ affirmed.

153.    Based on their review of this call and their knowledge of this investigation, agents believe that Alejandro MARTINEZ was able to obtain 10 pounds of methamphetamine for $4,500 per pound that he intended to give to CRI-2 so that CRI-2 could transport it to Chicago.

154.    On December 9, 2013, at approximately 12:19 pm, agents intercepted a telephone call between Francisco FELIX and an individual who identified himself as "Bolillia." During the call, Francisco FELIX told Bolillia that "the friend that I [Francisco FELIX] had told you is going to give you the things . . . [and] Gallo's friend" would have the "newspaper." Francisco FELIX told Bolilla that "Miguel" would "leave that off," and directed Bolilla to "give him that money that I told you about . . . give him twenty five pesos because it is twenty five pieces that I got him, that my Compadre Miguel got me."

155.    Based on their review of this call and their knowledge of this investigation, agents believe that during this call Francisco FELIX informed Bolilla that Miguel FELIX would be bringing him 25 pounds of methamphetamine and that CRI-2 would be arriving with the money. Francisco FELIX told Bolilla to give Miguel FELIX $25,000 for the methamphetamine he was delivering.

156.    At 12:47 pm that day, agents intercepted a telephone call between CRI-2 and Francisco FELIX. Prior to this call, Francisco FELIX had directed CRI-2 to travel to the Los Angeles, California, area to drop off the proceeds from what he believed to be the sale of 23 pounds of methamphetamine in Chicago, Illinois. Francisco FELIX also wanted CRI-2 to pick up 50 additional pounds of methamphetamine for delivery to Chicago, Illinois. During the call, Francisco FELIX told CRI-2 that CRI-2 would meet with Francisco FELIX's "brother" and give him "five bucks" for a "sick relative." Francisco FELIX continued that after that, CRI-2 would go "over there with Bollia . . . take twenty five pesos to Bollia. They will give you 25 chickens there." Francisco FELIX continued, "And then you will go to the same place for the rest of it."

157.   Based on their review of this call and their knowledge of this investigation, agents believe that during this call Francisco FELIX spoke to CRI-2 about picking up additional methamphetamine for transport back to Chicago, specifically directing CRI-2 to meet with Bollia to acquire 25 pounds of methamphetamine ("25 chickens") for which CRI-2 would give Bollia $25,000 ("25 pesos").

158.   At approximately 1:01 pm, CRI-2 contacted Bolilla at the number provided by Francisco FELIX. CRI-2 told Bolilla he was a friend of Francisco FELIX and that he was calling about "the chickens that were loose" (coded for methamphetamine). Bolilla asked CRI-2 how many newspapers Francisco FELIX had asked CRI-2 to give him. CRI-2 said twenty five ($25,000).

159.   At approximately 1:06 pm, Miguel FELIX contacted CRI-2 from telephone number 209-303-0318. Miguel FELIX and CRI-2 agreed to meet in San Fernando off of the freeway so that CRI-2 could give Miguel FELIX $5,000. At approximately 1:34 pm, agents observed Miguel FELIX parked at the 76 gas station on Foothill Road in Sylmar, California. At approximately 1:39 pm, agents observed CRI-2 get into the passenger side of Miguel FELIX's vehicle. During this time, CRI-2 gave Miguel FELIX $5,000, as he had previously been directed to do by Francisco FELIX.

160.   During a subsequent debrief with CRI-2, CRI-2 indicated that during his meeting with Miguel FELIX, Miguel FELIX made several statements regarding his involvement with the distribution of controlled substances. Miguel FELIX confirmed that he had assisted with the acquisition of the 23 pounds of methamphetamine that CRI-2 had received on November 26th, and that he was also the supplier of the ten kilograms of cocaine that CRI-2 was supposed to have delivered to Minneapolis, Minnesota, during the same Midwest trip. CRI-2 told Miguel FELIX that the Chicago buyers really liked the 23 pounds of methamphetamine but that they thought the weights were a little short. Miguel FELIX responded that that happens sometimes when the methamphetamine is brought across. Miguel FELIX explained that "Paco" (Francisco FELIX) had asked him to get that load last minute, and he didn't have the time.

161.   At approximately 3:44 pm, CRI-2 received a series of text messages from Francisco FELIX using the Whatsapp application. Through these text messages, Francisco FELIX directed CRI-2 to meet with Martin LOPEZ who had "42 chickens" (42 pounds of methamphetamine) ready for pick-up.

162.   At approximately 4:30 pm, CRI-2 arrived at the predetermined meet location on Glendon Road in Rosemead, California (the same location where the 23 pound meth deal had taken place on November 26, 2013) and met with MARTIN LOPEZ. Agents, who were conducting surveillance nearby, observed Martin LOPEZ remove large boxes wrapped in Christmas wrapping paper from the trunk of a vehicle and hand them to CRI-2. Agents observed CRI-2 then place the boxes into his truck.

163.   At approximately 4:30 pm, SA Ben Davidson and SA Eduardo Heredia (Cal DOJ) approached Martin LOPEZ as Martin LOPEZ was removing a third box from the trunk of his vehicle. The agents quickly detained Martin LOPEZ and began to question him at the scene.

After receiving consent from Martin LOPEZ, SA Davidson and SA Heredia discovered approximately 42 pounds of methamphetamine inside the three boxes Martin LOPEZ had provided to CRI-2.

164.    Martin LOPEZ subsequently gave SA Davidson and SA Heredia consent to search his apartment, which was located less than 100 yards away from the location of the bust. During the search, law enforcement agents located approximately 10 pounds of methamphetamine hidden in the master bedroom closet and the spare bedroom closet, as well as packaging materials, indicia for Martin LOPEZ, cell phones, Christmas wrapping paper that matched that used on the boxes provided to CRI-2, a functioning digital scale, and a large drive line for a motor vehicle that had recently been cut open to remove contraband.

165.    At approximately 8:44 pm, agents intercepted a call between "Sergio" (believed to be Sergio MODESTO) and Alejandro MARTINEZ during which Alejandro MARTINEZ said that he had not heard from CRI-2 yet and instructed Sergio MODESTO to "bring them to me dude." Alejandro MARTINEZ said that he would send Sergio MODESTO a message when CRI-2 was going to arrive and continued, "Did you see it?" Sergio MODESTO responded, "Yes dude. They look good . . . [but] . . . there are some that are very small . . . when they brought it over here, they forced it in." Sergio MODESTO then stated that the source wanted to know if Alejandro MARTINEZ would give "a little more than five." Alejandro MARTINEZ responded, "I told him five . . . let's see what he tells me, dude."

166.    Based on their review of this call and their knowledge of this investigation, agents believe that during this call Alejandro MARTINEZ and Sergio MODESTO discussed the availability of 10 pounds of methamphetamine that they were expecting to send with CRI-2 to buyers in Chicago, Illinois. When Sergio MODESTO mentioned that it was "small" because they "forced it in," agents believe that Sergio MODESTO was alluding to the methamphetamine crystals being damaged because they were forced into a small hidden compartment when they were smuggled into the United States. Finally, when Alejandro MARTINEZ said that he would talk to the guy about coming up with more than "five," agents believe that this was in reference to Alejandro MARTINEZ's calls with CRI-2 on December 8, 2013, during which Alejandro MARTINEZ said that they needed to pay $5,000 up front for the 10 pounds of methamphetamine.

167.    At approximately 9:31pm, agents intercepted a telephone call made by Francisco FELIX, who was using a telephone number from Mexico (526671957258), to Alejandro MARTINEZ. During the call, Francisco FELIX told Alejandro MARTINEZ, "Get rid of the number that I use for that, for that guy, man, because I think they, I think they busted him . . . go get another new one or something."

168.    Based on their review of this call and their knowledge of this investigation, agents believe that Francisco FELIX called Alejandro MARTINEZ from a previously unidentified number to tell Alejandro MARTINEZ that he should get rid of his current telephone and get a new one. Agents believe that by this point in time, Francisco FELIX had learned about the law enforcement bust that had occurred earlier in Rosemead, and assumed that both Martin LOPEZ and CRI-2 had been arrested and their phones seized and searched by law enforcement.

169.   On December 10, 2013, agents intercepted a call from Miguel FELIX to Alejandro MARTINEZ. During the call, Miguel FELIX asked Alejandro MARTINEZ if he knew about the "fucking mess that happened with the dude of the trailer." Alejandro MARTINEZ responded, "They got him." Miguel FELIX then stated that he had just met with CRI-2 "in Los Angeles . . . he gave me a little money here yesterday." Alejandro MARTINEZ then commented that CRI-2 must have been busted right after he met with Miguel FELIX. Miguel FELIX then told Alejandro MARTINEZ to "be on the lookout there where you are," and continued stating that "I had found him 25, dude." Alejandro MARTINEZ then stated, "The good thing is that he got caught over there." Miguel said that he had tried calling him, "but the friend did not answer." They both agreed that they should throw away their cellphones.

170.   Based on their review of this call and their knowledge of this investigation, agents believe that during this call Alejandro MARTINEZ and Miguel FELIX discussed the apparent arrest of CRI-2. Through this call, Miguel FELIX placed himself in Los Angeles the day before, stating that he had met with CRI-2 "in Los Angeles" and had received money from him. When Miguel FELIX said that he had "found him 25," agents believe that Miguel FELIX was referring to an additional 25 pounds of methamphetamine that the DTO wanted CRI-2 to transport to Chicago. When Miguel FELIX told Alejandro MARTINEZ to be on the "lookout there where you are," agents believe that Miguel FELIX was warning Alejandro MARTINEZ to be aware of any potential law enforcement activity around the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2.

171.   On December 24, 2013, agents conducting surveillance of 2921 Georgia Court in Tracy, California (hereinafter TARGET PROPERTY 7) observed a vehicle parked in the driveway, with California license plate 8P49223, registered to Jesus DELGADO.

172.   Also on December 24, 2013, officers with the Tracy Police Department made contact with the current occupants of TARGET PROPERTY 7. Josefina DELGADO-FELIX identified herself to officers with her Mexican identification card and stated that she resided at the residence with her husband, Jesus DELGADO, and sons. Josefina DELGADO-FELIX identified her cell phone number as 209-221-1473. This is the same phone number that was used to contact Francisco FELIX on November 27, 2013. Agents believe that during that intercepted call, Josefina DELGADO-FELIX spoke to Francisco FELIX about trimming marijuana.

173.   On December 30, 2013, officers with the Stockton Police Department made contact with the current occupants of TARGET PROPERTY 18. Martin RUBIO answered the door and identified himself with his California driver's license.[24] RUBIO stated that he was the owner of TARGET PROPERTY 18. Martin RUBIO also stated that he drove the gold colored Ford Explorer, license plate 4MQU803, that was parked in the driveway of TARGET PROPERTY 18.

174.   While the Stockton Police officers were speaking with Martin RUBIO at TARGET PROPERTY 18, offsite agents dialed telephone number 209-456-0253. A moment later, the

---

[24] Officers confirmed the driver's license provided by Martin RUBIO depicted a photograph of Martin RUBIO, his DOB as 08/16/1964, and his address as Target Property 18.

Stockton Police Officers heard a phone ringing in Martin RUBIO's front pants pocket. They watched as Martin RUBIO removed the phone from his pocket to answer it. Agents who had dialed the number from offsite then heard RUBIO answer the phone. During the period of the wire intercept of Francisco FELIX and Alejandro MARTINEZ, 209-456-0253 was intercepted during numerous pertinent calls.

175.    On January 7, 2014, Guardsmen with the California National Guard, Counter Drug Taskforce, established surveillance of TARGET PROPERTY 14. At approximately 4:45 pm, surveillance units observed an unidentified adult male exit the residence located on TARGET PROPERTY 14. Once outside, the unidentified male then proceeded to put on gloves and a white Tyvex chemical suit. I know based on my training and experience that this type of chemical suit is commonly worn to avoid hazardous chemicals associated with the illicit production of methamphetamine. After donning the chemical suit and gloves, the unidentified male removed two bags from a white van parked in front of the residence and moved those bags to a shed near the rear of the residence.

176.    At approximately 7:41 pm, surveillance units observed the same adult male, still wearing the Tyvex chemical suit, exit the residence and retrieve a large metal, square heating vessel from outside of the residence. The vessel appeared to be heavy, and the adult male struggled to move it inside the residence located at TARGET PROPERTY 14.

177.    On January 9, 2013, law enforcement agents conducted a drive by of TARGET PROPERTY 11 and observed a silver Nissan Maxima, California license plate number 6EUC299, registered to Sughey FELIX (with a release of liability to Francisco FELIX) parked in the driveway. Through this investigation I know that Sughey FELIX is the sister of Francisco and Miguel FELIX and a known drug trafficker.

178.    On January 14, 2014, SA Bryan contacted Stanislaus County Sheriff's Department and spoke with Sgt. Davis. According to Sgt. Davis, Stanislaus County Sheriff's Department records show Antonio RAMIREZ (aka Jose Antonio Ramirez Guzman (DOB: 06/23/1978, CII# A29372241)) is the last known resident of TARGET PROPERTY 9 as of August 2009. A MAVMIT analyst assigned to this investigation obtained a California drivers license photograph of Antonio RAMIREZ, which was subsequently shown to CRI-2. After reviewing the photograph, CRI-2 confirmed that Antonio RAMIREZ was the individual who had sold CRI-2 approximately two pounds of marijuana on May 30, 2013 at TARGET PROPERTY 9.

## PLACES TO BE SEARCHED

### Target Property 1 and Target Property 2 - Attachments A-1 and A-2
### 1700 and 1742 Almond Avenue, Patterson, California

179.    1700 and 1742 Almond Avenue in Patterson, California (TARGET PROPERTY 1 1 and TARGET PROPERTY 2) are two adjoining horse ranch properties that are owned by Augustin RAMIREZ. Throughout the period of this investigation, TARGET PROPERTY 1 and TARGET PROPERTY 2 have been the hub of the Felix DTO's operations. Surveillance, T-III wire intercepts, and controlled purchase operations have identified Francisco FELIX, Alejandro

MARTINEZ, Augustin RAMIREZ, Miguel FELIX, Alfonso MAGANA, Martin RUBIO, Rafael ALCAUTER, and other co-conspirators arriving and departing from the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2.

180.    On multiple occasions, the CRIs have met with Francisco FELIX, Alejandro MARTINEZ, and other FELIX DTO members at the horse ranch properties to discuss the purchase of narcotics and firearms, as well as the distribution of narcotics (See ¶¶ 15, 17, 35, 52, 56, 71, 72, 73 and 77 for examples of this activity).

181.    On June 19, 2013, CRI-2 purchased approximately 440 grams of methamphetamine from Alejandro MARTINEZ at the horse ranch properties (See ¶ 24).

182.    On July 18, 2013, approximately 50 marijuana plants were observed growing on the horse ranch properties (See ¶ 24).

183.    On July 25, 2013, CRI-2 purchased one pound of methamphetamine from Alejandro MARTINEZ at the horse ranch properties (See ¶ 35).

184.    On November 8, 2013, CRI-2 purchased four firearms from Alejandro MARTINEZ at the horse ranch properties (See ¶ 75).

185.    On November 10, 2013, CRI-2 purchased approximately 2.2 pounds of methamphetamine from Alejandro MARTINEZ at the horse ranch properties (See ¶ 84).

186.    On December 4, 2013, agents intercept calls and, through physical surveillance, observe activity related to the apparent retrieval of marijuana stored at the horse ranch properties (See ¶ 135 – 138).

187.    On multiple dates, intercepted calls from Felix DTO members regarding possible law enforcement surveillance of the horse ranch properties (See ¶ 98 – 101 and 170).

188.    Queries of Parcel Quest, a database of California property data obtained from county assessors' offices, indicate that both TARGET PROPERTY 1 and TARGET PROPERTY 2 are owned by Augustin RAMIREZ, with TARGET PROPERTY 3 (Francisco FELIX's primary residence) listed as the mailing address.

189.    On January 14, 2014, the Tuolumne Irrigation District confirmed that utility services in the name of Augustin Ramirez were currently active at TARGET PROPERTY 1. These services have been active since November 1, 2011.

190.    On January 14, 2014, Tuolumne Irrigation District confirmed that utility services in the name of Jesus Velasquez were currently active at TARGET PROPERTY 2. These services have been active since October 14, 2009.

### Target Property 3 - Attachment A-3
### 541 Kristen Way, Mountain House, California

191.    541 Kristen Way in Mountain House, California (TARGET PROPERTY 3) is the current and primary residence of Francisco FELIX and his girlfriend Blanca PENNE. This conclusion is based on a combination of surveillance of TARGET PROPERTRY 3 conducted during this investigation, as well as an examination of public and government records related to Francisco FELIX and Blanca PENNE.

192.    Throughout this investigation, agents conducting surveillance of Francisco FELIX have seen him enter and exit TARGET PROPERTY 3.

193.    During this investigation, agents installed a pole camera to monitor the front door and garage door of TARGET PROPERTY 3. The camera has captured images of Francisco FELIX arriving and departing from TARGET PROPERTY 3 on numerous occasions.

194.    Agents have observed Francisco FELIX driving a 2008 GMC Denali, bearing California license plate 6JZG740, which is registered to Francisco FELIX at TARGET PROPERTY 3. Francisco FELIX has been observed on numerous occasions parking the vehicle in the garage at TARGET PROPERTY 3 and on the street in front of the residence.

195.    Francisco FELIX has been observed on numerous occasions parking the 2008 GMC Denali in the garage at TARGET PROPERTY 3 and on the street in front of the residence.

196.    On January 8, 2014, Pacific Gas and Electric confirmed that utility services in the name of Francisco Javier FELIX were currently active at TARGET PROPERTY 3, and have been so since November 15, 2012.

### Target Property 4 - Attachment A-4
### 12737 Elm Avenue, Patterson, California

197.    12737 Elm Avenue in Patterson, California (Target Property 4) is a secondary residence for Francisco FELIX which is currently under construction. This conclusion is based on a combination of surveillance of Francisco FELIX and an examination of public records which show that TARGET PROPERTY 4 is owned by Francisco FELIX. Public records also indicate that the residence was purchased by Francisco FELIX for cash.

198.    On July 18, 2013, approximately 100 marijuana plants were observed growing on TARGET PROPERTY 4 (See ¶ 27).

199.    On September 19, 2013, agents observed Francisco FELIX meeting with individuals at TARGET PROPERTY 4 who were working the marijuana cultivation site located on the property. Law enforcement surveillance observed approximately 30 – 50 marijuana plants under cultivation at TARGET PROPERTY 4 that day (See ¶ 54).

200.   On January 14, 2014, Tuolumne Irrigation District confirmed that utility services were not active at TARGET PROPERTY 4.  The residence located on TARGET PROPERTY 4 is still under construction and appears unoccupied.

201.   Although the residence located at TARGET PROPERTY 4 is currently under construction and apparently uninhabited, I believe that the location may currently be used as a stash location for narcotics or US currency acquired through the sale and distribution of controlled substances.  Through your affiant's knowledge, training, and experience and conversations that I have had with other experienced narcotics investigators, I know that narcotics traffickers routinely build sophisticated hidden compartments inside their residences to conceal narcotics and US currency.

### Target Property 5 - Attachment A-5
### 1602 Pomegranate, Patterson, California

202.   1602 Pomegranate Avenue in Patterson, California, is the current residence of Augustin RAMIREZ.  Augustin RAMIREZ is the owner of the adjoining horse ranch properties at TARGET PROPERTY 1 and TARGET PROPERTY 2.

203.   Augustin RAMIREZ was present on at least two occasions when CRI-2 negotiated and/or purchased methamphetamine or firearms.  On August 14, 2013, Augustin RAMIREZ was with Francisco FELIX at the horse ranch properties when he met with CR-2 to discuss the transportation of narcotics (¶¶ 51 – 52).  On November 8, 2013, Augustin RAMIREZ was with Francisco FELIX and Alejandro MARTINEZ at the horse ranch properties when they met with CRI-2 to arrange the purchase and distribution of three pounds of methamphetamine and several firearms (¶¶ 73 and 75).

204.   On November 8, 2013, Augustin RAMIREZ attempted to locate methamphetamine for CRI-2 at the behest of Francisco FELIX (¶ 73).

205.   While Augustin RAMIREZ's current involvement in the production of methamphetamine is unknown, Augustin RAMIREZ is known to currently have access to finished methamphetamine sources and was referred to as an old meth cook by Alejandro MARTINEZ during the November 8, 2013, controlled purchase operations with CRI-2 at Augustin RAMIREZ's horse ranch properties (¶ 75).

206.   On January 14, 2014, Tuolumne Irrigation District confirmed that utility services in the name of Ramona Ramirez are currently active at TARGET PROPERTY 5, and have been since November 24, 2008.  Ramona Ramirez is the wife of Augustin RAMIREZ.

207.   Additionally, agents know that Augustin RAMIREZ drives a maroon truck bearing California license plate 6D41334 and a Mercedes bearing California license plate 3DCW665, both of which are registered to Augustin RAMIREZ at TARGET PROPERTY 5.

208.   Queries of historical satellite photography of TARGET PROPERTY 5 from Google Earth show images consistent with an outdoor marijuana grow during the 2012 calendar year (photograph date – August 23, 2012) while Augustin RAMIREZ resided at the residence.

209.   On numerous occasions during the course of this investigation, Augustin RAMIREZ was observed driving from his adjoining horse ranch properties at TARGET PROPERTY 1 and TARGET PROPERTY 2 to TARGET PROPERTY 5.

### Target Property 6 - Attachment A-6
### 818 West Tuolumne Road, Ceres, California

210.   818 West Tuolumne Road in Ceres, California (TARGET PROPERTY 6), is owned by Salvador RODRIGUEZ.  Utilities for TARGET PROPERTY 6 are in the name of Diego O. De Anda, and have been since February 13, 2013.

211.   According to local law enforcement detectives in Modesto, TARGET PROPERTY 6 is associated with a suspected drug cartel related double homicide that occurred in 2010.  The victims of that homicide, Jose and Luis VILLARUBIO, have still not been located.  Francisco FELIX remains a suspect in that homicide investigation (¶ 28).

212.   On July 18, 2013, agents observed Francisco FELIX drive from TARGET PROPERTY 2 to TARGET PROPERTY 6 (¶ 28).

213.   Also on July 18, 2013, approximately 75 marijuana plants were observed growing on TARGET PROPERTY 6 (See ¶ 30).

214.   Agents have observed a vehicle known to have a non-factory hidden compartment at the residence (See ¶ 29).

215.   As recently as November 14, 2013, agents observed a vehicle bearing Baja California license plate AKL8324 travel from the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 to TARGET PROPERTY 6.  This vehicle has been observed at TARGET PROPERTY 6 throughout this investigation.  Moreover, queries of HSI databases indicate that this same vehicle crossed into the United States from Mexico nine times between January 2013 and April 2013.  Records also indicate that in April 2013, Customs and Border Protection received an anonymous phone call indicating that the vehicle was possibly laden with narcotics (See ¶ 97).

### Target Property 7 – Attachment A-7
### 2921 Georgia Ct, Tracy, CA

216.   2921 Georgia Court in Tracy, California, is the current residence of Jesus DELGADO and Josefina DELGADO-FELIX (sister of Francisco FELIX).  Jesus DELGADO is Josefina DELGADO-FELIX's husband.  They live at TARGET PROPERTY 7 with their sons "Javier" (a.k.a "Javi") and "Henry."  This conclusion is based on a combination of surveillance of TARGET PROPERTY 7 conducted during this investigation, law enforcement contact with

Josefina DELGADO-FELIX at TARGET PROPERTY 7, as well as an examination of public and government records related to Jesus DELGADO and Josefina DELGADO-FELIX.

217.   Independent DEA sources indicate that Josefina DELGADO-FELIX and her sons Javier and Henry are involved with the marijuana operations of the FELIX DTO.

218.   On November 27, 2013, agents intercepted a telephone call between Josefina DELGADO-FELIX and Francisco FELIX.  During the call, Josefina DELGADO-FELIX inquired about her sons, Javi and Henry, being picked up to trim marijuana for the FELIX DTO (¶ 121 - 122).

219.   In a call intercepted less than 30 minutes later between Francisco FELIX and Chuito, Chuito, who referred to Francisco FELIX as "uncle," told Francisco FELIX that they completed "two rooms."  Francisco FELIX asked, "How many hangers came out?"  Chuito responded, "Javi and I made, uh, eleven and a half."  The conversation continued about accounting for how many "hangers" were left and letting Francisco FELIX know so that he could make sure that nobody tried to steal some (¶ 123).

220.   On December 24, 2013, agents observed a vehicle in the driveway at TARGET PROPERTY 7 bearing California license plate 8P49223, registered to Jesus DELGADO.

221.   A check of PG&E utility services for TARGET PROPERTY 7 indicates that the utilities are in the name of Jesus DELGADO, and have been active since November 2005.

222.   On December 24, 2013, Josefina DELGADO-FELIX identified herself to law enforcement officers with her Mexican identification card and stated that she resided at the residence with her husband and sons.  Josefina DELGADO-FELIX identified her cell phone number as 209-221-1473 (the same phone number used during the intercepted call referenced in paragraphs 121, 122, and 218).

### Target Property 8 – Attachment A-8
### 523 Hathaway Mountain House CA

223.   523 Hathaway Street, Mountain House, California (TARGET PROPERTY 8) is believed to be the residence of Silbestre FELIX, Jesus NUNEZ, and their son "Chuito" (believed to be Jesus NUNEZ-FELIX).  All three individuals have been identified through this investigation as being family members and criminal co-conspirators of Francisco FELIX.  This belief has been formed through surveillance observations, intercepted phone calls, telephone subscriber information, and GPS ping information.

224.   In April of 2013, SA Olivera obtained a GPS location order for cell phone number 510-681-1192.  The subscriber for this telephone was listed as Silbestre FELIX.  Subsequent GPS ping results showed that the device associated with this number was consistently located at TARGET PROPERTY 8.  Queries of CP Clear indicate that Silbestre FELIX currently resides at TARGET PROPERTY 8.

225.   PG&E utility records indicate that the services at TARGET PROPERTY 8 are in the names of Silbestre FELIX and Jesus NUNEZ Pena, and have been since July of 2012. Furthermore, telephone number 510-681-1192 has been listed as the contact number for the PG&E account associated with TARGET PROPERTY 8.

226.   Throughout the wire intercept of Francisco FELIX's telephone, agents intercepted a number of phone calls between Francisco FELIX and Chuy on 510-338-5083 that pertained to what agents believe to be the cultivation and trafficking of marijuana.  During one such intercepted telephone conversation on November 7, 2013, agents believe that Chuy explained to Francisco FELIX that he had 600 pounds of marijuana available.  In December of 2013, SA Olivera obtained a GPS location order for 510-338-5083.  The GPS location data indicated that the phone was consistently located at TARGET PROPERTY 8 (¶¶ 67 – 70).

227.   On November 13, 2013, Francisco FELIX received an incoming call from "Chuito" at 209-221-2473.  Subscriber information from Metro PCS for this phone indicates that it is subscribed to Jesus NUNEZ at TARGET PROPERTY 8.  Throughout the call, Chuito referred to Francisco FELIX as "uncle."  Chuito told Francisco FELIX that they completed "two rooms."  When Francisco FELIX asked "how many hangers came out," Chuito responded that "Javi and I made, uh, eleven and a half."  The conversation continued about accounting for how many "hangers" were left and letting Francisco FELIX know so that he could make sure that nobody tried to steal some.

## Target Property 9 - Attachment A-9
## 1301 North Vincent Road, Turlock, California

228.   1301 North Vincent Road in Turlock, California (TARGET PROPERTY 9) is the residence of Antonio RAMIREZ (a.k.a. "Tonio").  Agents believe that this residence is utilized by Antonio RAMIREZ as a stash location for narcotics and firearms.

229.   On May 30, 2013, Antonio RAMIREZ sold CRI-2 approximately 862 grams of marijuana at TARGET PROPERTY 9 (¶¶ 21, 22 and 178).

230.   During this same transaction, Antonio RAMIREZ offered to sell CRI-2 20-30 pounds of methamphetamine the following day for $6,000-$7,000 per pound.  CRI-2 also viewed approximately one ounce of methamphetamine at the residence located at TARGET PROPERTY 9 (¶ 22).

231.   On September 24, 2013, an unidentified gun broker affiliated with the FELIX DTO, after meeting with CRI-2, was observed driving to TARGET PROPERTY 9 (¶ 59).

232.   Stanislaus County Sheriff's Department records show Antonio RAMIREZ is the last known resident of TARGET PROPERTY 9 as of August 2009.

233.   On January 14, 2014, Tuolumne Irrigation District informed agents that they do not provide service for TARGET PROPERTY 9, but they do provide service for the adjoining parcel at 1305 North Vincent Road in Turlock, California.  Tuolumne Irrigation District

confirmed the billing address for 1305 North Vincent Road is TARGET PROPERTY 9. The name under the account is "Bernardo Dearcos," and has been since September 12, 2013. Bernardo Dearcos has a hit in WSIN for marijuana cultivation.

### Target Property 10 - Attachment A-10
### 1900 E. Grayson Road, Ceres, California

234.   1900 E. Grayson Road in Ceres, California (TARGET PROPERTY 10) is owned by Ramon DIAZ.

235.   During the 2010 investigation of the apparent double homicide of Jose and Luis Villarubio, the Modesto Police Department received information regarding a possible connection to TAGET PROPERTY 10.  Investigators learned that Francisco FELIX and Miguel FELIX had threatened Jose and Luis Villarubio.  They also learned that at the time Francisco FELIX was overseeing an indoor marijuana grow operation at TARGET PROPERTY 10.  When the homicide investigators traveled to TARGET PROPERTY 10, they observed evidence of an indoor marijuana grow at that location, including a rapidly spinning electric meter, electrical supplies and wiring stored around the house, large osculating fans located inside the residence, and a foam brick on the counter that detectives recognized as an item commonly used in marijuana production.  "Ramon" was identified by one informant as the owner of TARGET PROPERTY 10.

236.   On July 18, 2013, agents observed Francisco FELIX meet with an unidentified individual at TARGET PROPERTY 10 (¶ 31). That same day, approximately 75 marijuana plants were observed growing on TARGET PROPERTY 10 (See ¶ 32).

237.   On November 19, 2013, agents intercepted a phone call between Francisco FELIX and "Ramon."  Ramon asked Francisco FELIX if "Mili" had changed his phone number.

238.   In January of 2014, agents conducting surveillance of TARGET PROPERTY 10 observed a large (two feet in diameter) ducting running along the roofline of the residence.  The duct work was consistent with the type of ventilation used for an indoor marijuana grow.

239.   Property records for TARGET PROPERTY 10 indicate that the property is owned by Ramon DIAZ Jr.

240.   Checks with the USPIS indicate that Ramon DIAZ, Leidi Felix, and Graciela Villa are currently receiving mail at TARGET PROPERTY 10.

241.   On January 14, 2014, Tuolumne Irrigation District confirmed that utility services in the name of Imelda DIAZ are currently active at TARGET PROPERTY 10, and have been so since May 30, 2003.  Checks of CP Clear indicate that Ramon DIAZ currently resides at TARGET PROPERTY 10 and lists Imelda Diaz as a relative.

### Target Property 11 – Attachment A-11
### 3941 Northern Oak Drive, Ceres, California

242. Agents believe that 3941 Northern Oak Drive in Ceres, California (TARGET PROPERTY 11), is the current and primary residence of Miguel FELIX and his girlfriend Karla SILVA. This belief is based on intercepted calls and surveillance observations (¶¶ 86 and 88).

243. As detailed previously in this affidavit, Miguel FELIX is an identified narcotics trafficker and high-ranking member of the FELIX DTO who assists with the acquisition and distribution of methamphetamine (¶¶ 72, 98, 103, 111, 113, 159, 160, and 169).

244. A vehicle believed to be operated by Miguel FELIX has been frequently observed parked at TARGET PROPERTY 11. Moreover, agents have observed Miguel FELIX exit the front door of the residence located at TARGET PROPERTY 11 in the early morning hours (¶ 88).

245. A vehicle registered to Karla SILVA has also been frequently observed parked at TARGET PROPERTY 11. This same vehicle was observed at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 on November 6, 2013 (¶ 87).

246. Utilities at TARGET PROPERTY 11 are in the name of Karla SILVA, and have been since July 18, 2012. Agents know that Karla SILVA is an associate of Francisco FELIX and girlfriend of Miguel FELIX. SA Olivera has seen Karla SILVA in family photographs with Francisco FELIX and Miguel FELIX that were posted on Facebook over the Christmas holiday in 2013.

### Target Property 12 - Attachment A-12
### 557 Traina Drive, Patterson, California

247. 557 Traina Drive in Patterson, California (TARGET PROPERTY 12), is the residence of Alfonso MAGANA. Alfonso MAGANA has been identified through the investigation as a distributor of marijuana and methamphetamine for Francisco FELIX.

248. During the course of the wire intercept, agents have intercepted numerous pertinent phone calls between "Alfonso" (believed to be Alfonso MAGANA) and Francisco FELIX. Each time, Alfonso MAGANA has been intercepted using a telephone number that is subscribed to Adrianna Magana at TARGET PROPERTY 12. During one such call, on November 8, 2013, Alfonso MAGANA engaged in a conversation with Francisco FELIX about the distribution of marijuana and methamphetamine (¶¶ 76 – 78 and 95 – 96).

249. During surveillance, agents have observed Alfonso MAGANA exit the front door of the residence located at TARGET PROPERTY 12, smoke a cigarette, and the re-enter the residence.

250.    On January 8, 2014, PG&E confirmed that utility services in the name of Alfonso and Adrianna MAGANA are currently active at TARGET PROPERTY 12, and have been since January 28, 2009.

### Target Property 13 - Attachment A-13
### 2104 Manhattan Way, Modesto, California

251.    Agents believe that 2104 Manhattan Way in Modesto, California (TARGET PROPERTY 13), is the current residence of Daisy MEDINA.   Agents believe that TARGET PROPERTY 13 is currently being used by members of the FELIX DTO to store and/or cultivate marijuana.

252.    On November 12, 2013, agents observed a black Nissan Altima, with license plate number 6SLW190, located at the horse ranch properties.  This vehicle, which is registered to Daisy MEDINA at TARGET PROPERTY 13, has been observed at the horse ranch properties on previous occasions (¶ 90).

253.    A short time later, this same vehicle was observed leaving the horse ranch properties with Alejandro MARTINEZ inside and driving to TARGET PROPERTY 13 (¶¶ 91 - 92).

254.    Shortly after this vehicle arrived at TARGET PROPERTY 13, a SUV was observed backing out of the garage at TARGET PROPERTY 13 and driving to a nearby waste station.  Once there, an unidentified adult male exited the SUV and removed 11 large black garbage bags from the vehicle which he then left at the transfer station.  When law enforcement subsequently searched the bags, they found evidence of an indoor marijuana grow operation, including marijuana plant root balls, stems, marijuana plant clippings, foam grow cubes with stalks and root balls, fertilizer, oven bag boxes, receipts, and rubber gloves (¶¶ 93 – 94).

255.    On January 8, 2014, PG&E confirmed that utility services in the name of Daisy MEDINA are currently active at TARGET PROPERTY 13, and have been since April 4, 2012.

### Target Property 14 – Attachment A-14
### 18910 6th Avenue, Stevinson, California

256.    18910 6th Avenue in Stevinson, California (TARGET PROPERTY 14) is believed to be the current residence of Emmanuel ARVIZU.  Emmanuel ARVIZU is a member of the FELIX DTO, and agents believe that he and other members of the DTO are using TARGET PROPERTY 14 as a location to manufacture methamphetamine.  This belief is based on intercepted calls as well as surveillance of this location.

257.    During the interception of wire communications over Alejandro MARTINEZ's telephone, "Manuel" has been intercepted approximately 73 times using telephone number 818-693-3193.  Subscriber information for this number shows that it is subscribed to Emmanuel ARVIZU.  Moreover, Emmanuel ARVIZU has until recently listed TARGET PROPERTY 14 as

his current residence on his probation paperwork (Emmanuel ARVIZU is currently on felony searchable probation for a state narcotics conviction) (¶ 74).

258.   On November 8, 2013, agents intercepted a call between Alejandro MARTINEZ and Emanuel ARVIZU, who was using 818-693-3193.  Agents believe that during the call, both men discussed locating three pounds of methamphetamine for CRI-2 (¶ 74).

259.   On November 16, 2013, agents intercepted a call between Alejandro MARTINEZ and Emanuel ARVIZU, who was using 818-693-3193.  Agents believe that during this call, Emanuel ARVIZU notified Alejandro MARTINEZ that he had located methamphetamine for CRI-2 (¶ 104).

260.   On November 19, 2013, agents intercepted a call between Alejandro MARTINEZ and Emanuel ARVIZU, who was using 818-693-3193.  Agents believe that during this call, both men discussed the prospects of locating 50 pounds of methamphetamine for CRI-2 (¶ 109).

261.   On several occasions, a vehicle known to be utilized by Miguel FELIX has been observed driving from the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 to TARGET PROPERTY 14.

262.   On January 7, 2014, Guardsmen with the California National Guard, Counter Drug Taskforce, while conducting surveillance of TARGET PROPERTY 14, observed an unidentified adult male exit the residence located on TARGET PROPERTY 14.  Once outside, the unidentified male then proceeded to put on gloves and a white Tyvex chemical suit.  After donning the chemical suit and gloves, the unidentified male was observed moving bags of an unknown substance and a heavy metal heating vessel into the residence (conduct consistent with, although not necessarily dispositive of, a methamphetamine manufacturing operation (¶ 175).

263.   A check of PG&E utility services for TARGET PROPERTY 14 indicates that utility services have not been provided to this location since September 13, 2013.

264.   Checks with the USPIS indicate that mail is being received at the residence for Emmanuel ARVIZU, Magdalena Guardado-Garcia, Mario Espinosa, and Mario Lopez.

### Target Property 15 – Attachment A-15
### 2207 Orange Avenue, Patterson, California

265.   2207 Orange Avenue, Patterson, California (TARGET PROPERTY 15) is believed to be the residence of Leonaires ALCAUTAR.  Leonaires ALCAUTAR is believed to be a criminal co-conspirator of Francisco FELIX and involved in the illicit cultivation and sales of marijuana.  This belief is based on intercepted calls and surveillance observations.

266.   During the wire intercept of Target Telephone 1, agents intercepted no less than six pertinent telephone calls between Leonaires ALCAUTER using 510-867-4568 and Francisco FELIX.  During these telephone calls, Francisco FELIX and Leonaires ALCAUTER discussed marijuana trafficking.

267.   On December 2, 2013, agents intercepted a call during which Leonaires ALCAUTAR and Francisco FELIX discussed what agents believe to be the trafficking and sale of marijuana.  The two parties agreed to meet the following day.  Surveillance the following day, followed Francisco FELIX to TARGET PROPERTY 15 (¶¶ 126 – 130).

268.   A check of PG&E utility services for TARGET PROPERTY 15 indicates that utility services are currently in the name of Guadalupe Perez and have been since January 27, 2006.  Ownership information for the address indicates that the property is owned by Guadalupe Perez and Leonaires ALCAUTAR-Perez.

### Target Property 16 - Attachment A-16
### 1215 Golden Eye Court, Newman, California

269.   1215 Golden Eye Court, Newman, California (TARGET PROPERTY 16) is believed to be the residence of Rafael ALCAUTAR.  Rafael ALCAUTAR is believed to be a criminal co-conspirator of Alejandro MARTINEZ and Francisco FELIX, and involved in the illicit cultivation and sale of marijuana.  This belief is based on intercepted calls and surveillance observations.

270.   During the wire intercept of Alejandro MARTINEZ's telephone, agents intercepted no less than 35 pertinent telephone calls between Rafael ALCAUTER using 510-385-1463 and Alejandro MARTINEZ.  During these telephone calls, Alejandro MARTINEZ and Rafael ALCAUTER discussed marijuana trafficking (¶ 145).

271.   On December 4, 2013, agents intercepted a call between Rafael ALCAUTER and Alejandro MARTINEZ.  Agents believe that during the call, Rafael ALCAUTER talked to Alejandro MARTINEZ about acquiring 10 pounds of a particular strain of marijuana (¶ 142).

272.   In the early morning hours of December 5, 2013, agents observed Rafael ALCAUTAR exiting TARGET PROPERTY 16 and traveling to 27207 Highway 33, Newman, California (TARGET PROPERTY 17).  Rafael ALCATEUR is listed as the owner of TARGET PROPERTY 17 (¶ 143).

273.   Later that morning, agents followed Rafael ALCAUTAR to a Bank of America branch in Gustine, California.  While Rafael ALCAUTER and the agents were inside the branch, the agents dialed telephone 510-385-1463 (the same number that had been intercepted).  The agents heard the phone ring and saw and heard Rafael ALCATEUR answer it (¶ 143).

274.   At 10:20 am, Rafael ALCAUTER drove to the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2, and attempted to make two phone calls to Alejandro MARTINEZ which did not connect (¶ 144).

275.   Rafael ALCAUTER was then observed traveling to TARGET PROPERTY 4 (Francisco FELIX's secondary residence).  Shortly after Rafael ALCAUTER arrived at TARGET PROPERTY 4, agents intercepted a call from Alejandro MARTINEZ made to Rafael

ALCAUTER at 510-385-1463. During the call, Rafael ALCAUTER told Alejandro MARTINEZ that he was there and waited for him, but he didn't come out so he left. Rafael ALCAUTER told Alejandro MARTINEZ that he would be heading back to get that "job" (¶ 145).

276. After returning to the horse ranch properties, Rafael ALCAUTER met with an unidentified male and then returned to his residence at TARGET PROPERTY 17 (¶ 146).

277. DMV Registration checks have identified no less than three vehicles registered to Rafael ALCAUTAR at TARGET PROPERTY 16.

278. On January 8, 2014, PG&E confirmed that utility services in the name of Veronica ALCAUTER are currently active at TARGET PROPERTY 16, and have been since December 15, 2008. Furthermore, PG&E representatives indicated that the power usage at the location is consistent with a possible indoor marijuana grow operation.

### Target Property 17 - Attachment A-17
### 27207 Highway 33, Newman, California

279. Property ownership information indicates that Rafael ALCAUTAR is the owner of TARGET PROPERTY 17. Rafael ALCAUTAR is believed to be a criminal co-conspirator of Alejandro MARTINEZ and Francisco FELIX, and involved in the illicit cultivation and sales of marijuana. This belief is based on intercepted calls and surveillance observations (refer to summary above for TARGET PROPERTY 16 - ¶¶ 271 - 277).

280. Surveillance of Rafael ALCAUTAR at TARGET PROPERTY 17 has observed him accessing the entire property, entering the residence, and retrieving mail from the mailbox.

281. On January 8, 2014, PG&E confirmed that utility services in the name of Rafael and Veronica ALCAUTER are currently active at TARGET PROPERTY 17, and have been so since January 25, 2006.

### Target Property 18 - Attachment A-18
### 1840 Fort Hall Place, Stockton, California

282. 1840 Fort Hall Place, Stockton, California (TARGET PROPERTY 18), is believed to be the residence of Martin RUBIO. Martin RUBIO is believed to be a criminal co-conspirator of Alejandro MARTINEZ and Francisco FELIX, and involved in the illicit cultivation and sale of marijuana. Agents also believe that TARGET PROPERTY 18 may have an indoor marijuana grow operation. This belief is based on intercepted calls, information from utility services, and surveillance observations.

283. During the wire intercept, agents intercepted no less than 28 pertinent telephone calls between Martin RUBIO (a.k.a. "Chichi") using 209-456-0253, Alejandro MARTINEZ, and Francisco FELIX. During these telephone calls, Alejandro MARTINEZ, Francisco FELIX, and Martin RUBIO discussed what agents believe to be marijuana cultivation and sales.

284.   On December 4, 2013, agents intercepted a call between Martin RUBIO and Francisco FELIX.  Agents believe that during the call, Martin RUBIO and Francisco FELIX discussed picking up marijuana at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 (¶ 135).

285.   Following this call, agents observed a green Dodge Dart arrive at the horse ranch properties.  The vehicle was subsequently followed to a parking lot where agents observed an apparent hand to hand transaction consistent with narcotics sales.  The driver of the vehicle was subsequently identified as Martin RUBIO (¶¶ 136 – 141).

286.   DMV records checks identified two vehicles registered to Martin RUBIO parked at TARGET PROPERTY 18.

287.   On December 30, 2013, officers with the Stockton Police Department made contact with the current occupants of TARGET PROPERTY 18.  Martin RUBIO answered the door and identified himself with his California driver's license.  Additionally, after agents placed a call to 209-456-0253, the officers observed Martin RUBIO answer the phone call (¶¶ 173 – 174).

288.   On January 8, 2014, PG&E confirmed that utility services in the name of Jose Luis ESPINOSA are currently active at TARGET PROPERTY 18, and have been so since January 20, 2010.  Furthermore, PG&E representatives indicated that the power and gas usage at the location is consistent with a possible indoor marijuana grow operation.

## PERSONS TO BE ARRESTED

289.   **Francisco** Javier **Andrade FELIX (a.k.a. "Paco"):**

(a) FELIX is the head of the FELIX DTO.

(b) To date, agents have seized over 85 pounds of methamphetamine from Francisco FELIX and/or Francisco FELIX's organization through controlled purchases and other undercover operations.   Additionally, Francisco FELIX has directly attempted to acquire no less than 50 additional pounds of methamphetamine for CRI-2 during an attempted controlled pickup operation.

(c)  Although not physically present at these controlled buys and pickup operations, Francisco FELIX has been referred to as "the boss" on multiple occasions, and Francisco FELIX did directly facilitate the purchase of 1,000 grams of methamphetamine, the delivery of approximately 23 pounds of methamphetamine, and the delivery of approximately 42 pounds of methamphetamine by arranging for the drugs and setting the price, as detailed below:

(i) On November 8, 2013, CRI-2 met with Francisco FELIX at the adjoining horse ranch properties located at TARGET PROPERTY I and TARGET

PROPERTY 2 for the purpose of purchasing three pounds of methamphetamine. After Francisco FELIX, Alejandro MARTINEZ, and Augustin RAMIREZ attempted to locate the methamphetamine, CRI-2 was informed that the methamphetamine was not ready. During this time, Francisco FELIX propositioned CRI-2 to transport kilogram quantities of cocaine to Minnesota for his brother, Miguel Angel FELIX aka "Mili" (¶¶ 71 – 73).

(ii) On November 19, 2013, Francisco FELIX attempted to coordinate the delivery of 50 pounds of methamphetamine to CRI-2 so that CRI-2 could transport those narcotics to Chicago, Illinois, for distribution. While CRI-2 was standing by in the Los Angeles area, Francisco FELIX told CRI-2 that the methamphetamine was low quality and that he did not want to sell the inferior product to the buyers in Chicago. Francisco FELIX then told CRI-2 that he would find an alternate source of supply for the methamphetamine (¶ 108).

(iii) On November 26, 2013, Francisco FELIX coordinated the delivery of approximately 23 pounds of methamphetamine to CRI-2 for transportation to Chicago, Illinois. The 23 pounds of methamphetamine was subsequently seized by agents (¶¶ 111 – 126).

(iv) On December 9, 2013, FELIX coordinated the delivery of approximately 42 pounds of methamphetamine by CRI-2 for transportation to Chicago, Illinois. The 42 pounds of methamphetamine was also subsequently seized by agents (¶¶ 154 – 161).

(d) A TIII wire intercept of Francisco FELIX's telephone (510-427-7446) revealed additional information about his drug trafficking organization, including the names and locations of additional sources of supply and mid-level distributors working for him.

290. **Alejandro MARTINEZ (a.k.a. "Pelon", "Gallo", or "El Gallo"):**

(a) On June 19, 2013, CRI-2 purchased 440 grams of methamphetamine from Alejandro MARTINEZ for $7,000. Following this transaction, CRI-2 and Alejandro MARTINEZ discussed a future 30 pound methamphetamine deal (¶ 24).

(b) On July 25, 2013, CRI-2 purchased approximately 454 grams of methamphetamine from Alejandro MARTINEZ for $7,000 (¶ 35).

(c) On August 14, 2013, CRI-2 met with Alejandro for the purpose of purchasing two assault rifles. Alejandro told CRI-2 the rifles were in Stockton and directed Sergio MODESTO to ride with CRI-2 to Stockton to pick up the guns. Agents subsequently followed MODESTO and CRI-2 to Stockton where they met with Gerardo BARRAZA and "Tavo." BARRAZA and Tavo sold CRI-2 a Ruger Mini 30 rifle and a Norinco SKS assault style rifle for $2,200 (¶¶ 42 - 48).

55

(d) On November 8, 2013, CRI-2 purchased an AR-15 assault style rifle, a SKS assault style rifle, an AK-47 assault style rifle, and a .50 caliber Desert Eagle semi-automatic handgun from Alejandro MARTINEZ for $3,700 (¶ 75).

(e) On November 10, 2013, CRI-2 purchased approximately 1,000 grams of methamphetamine from Alejandro MARTINEZ for $10,000 (¶ 84).

(f) On November 19, 2013, Alejandro MARTINEZ attempted to locate an alternate source of supply for up to 50 pounds of methamphetamine for CRI-2 for delivery to Chicago, Illinois, after the initial deal that FELIX coordinated fell through (¶¶ 108 - 110).

(g) A wire intercept of Alejandro MARTINEZ's telephone (209-535-2168) revealed additional information about his role in the drug trafficking organization, including the names and locations of additional sources of supply and mid-level distributors working for him and the FELIX DTO.

291. **Miguel FELIX (a.k.a. "Mili"):**

(a) On November 8, 2013, CRI-2 met with Francisco FELIX at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 for the purpose of purchasing three pounds of methamphetamine. During this meeting, Francisco FELIX propositioned CRI-2 to transport kilogram quantities of cocaine to Minnesota for his brother, Miguel FELIX (aka "Mili") (¶ 72).

(b) On December 9, 2013, Francisco FELIX coordinated the delivery of approximately 42 pounds of methamphetamine to CRI-2. Prior to the delivery taking place, Francisco FELIX directed CRI-2 to meet with Miguel FELIX and provide him with $5,000 (¶ 131).

(c) At the direction of Francisco FELIX, CRI-2 met with Miguel FELIX and gave him $5,000. During a subsequent debrief with CRI-2, CRI-2 indicated that Miguel FELIX made statements regarding his involvement with the prior 23 pounds of methamphetamine that CRI-2 had acquired from the FELIX DTO, as well as his own narcotics trafficking activities (¶ 160).

(d) After the December 9, 2013, seizure of 42 pounds of FELIX DTO methamphetamine in Rosemead, California, agents intercepted a telephone between Miguel FELIX using and Alejandro MARTINEZ. During the call, Miguel FELIX asked Alejandro MARTINEZ if he knows what happened to CRI-2. Alejandro MARTINEZ responded that he got "busted." Miguel FELIX then told Alejandro MARTINEZ that it was strange because he had met with CRI-2 shortly before that and CRI-2 had given him some money (the $5,000). Miguel FELIX said that he already had "25" (25 pounds of

methamphetamine) for CRI-2, and that he felt lucky he wasn't with CRI-2 when he got busted (¶¶ 169 - 170).

292. **Augustin RAMIREZ:**

(a) Augustin RAMIREZ is the owner of the horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2. On July 18, 2013, SA Sean Crooks identified approximately 50 marijuana plants growing on TARGET PROPERTY 1 (¶ 27).

(b) On November 8, 2013, Augustin RAMIREZ, at the direction of Francisco FELIX, attempted to locate three pounds of methamphetamine for CRI-2 (¶ 73).

(c) Also on November 8, 2013, Alejandro MARTINEZ told CRI-2 that Augustin RAMIREZ used to cook methamphetamine (¶ 75).

(d) On December 9, 2013, agents intercepted an incoming phone call Augustin RAMIREZ to Alejandro MARTINEZ. During the call, Augustin RAMIREZ asked Alejandro MARTINEZ, "What time will the man arrive?" Alejandro responded, "He's already on the road. He's coming from Los Angeles." Augustin RAMIREZ then asked, "Will he arrive tonight?" Alejandro responded, "Yes, I will call you." During this time, CRI-2 was in the Los Angeles area and was in contact with Alejandro MARTINEZ regarding the pickup of approximately 10 pounds of methamphetamine from the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2. Agents believe that Augustin RAMIREZ was inquiring with Alejandro MARTINEZ regarding CRI-2's location for the pending pickup of 10 pounds of methamphetamine from the Augustin RAMIREZ's horse ranch properties.

293. **Sergio MODESTO:**

(a) On July 25, 2013, Sergio MODESTO offered to sell cocaine to CRI-2 for $22,000 a kilogram, as well as methamphetamine for $12,500 per kilogram. Sergio MODESTO told CRI-2 that he could take CRI-2 to Los Angeles to pick up the cocaine and methamphetamine or he could have it delivered (¶ 37).

(b) On August 14, 2013, CRI-2 met with Alejandro MARTINEZ for the purpose of purchasing two assault rifles. Alejandro MARTINEZ told CRI-2 the rifles were in Stockton and directed Sergio MODESTO to ride with CRI-2 to Stockton to pick up the guns. While on their way to pick up the firearms, Sergio MODESTO told CRI-2 that he needed to make a stop in Ceres to pick up money for "Paco" (Francisco FELIX). When CRI-2 asked Sergio MODESTO who "Paco" was, MODESTO responded that "Paco" was the man

in charge.  Agents believe that Sergio MODESTO was told to pick-up the money by Francisco FELIX (¶¶ 44 - 46).

(c) On December 9, 2013, Alejandro MARTINEZ arranged for the delivery of 10 pounds of methamphetamine to the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2.  Agents believe that the sourcing for this ten pounds was coordinated through Sergio MODESTO (who was using telephone number 209-312-5735).  This belief is supported by the following intercepted calls:

   (i) On December 7, 2013, agents intercepted a telephone call between Alejandro MARTINEZ and Sergio MODESTO.  MODESTO asked MARTINEZ if he still wanted "that," and said that he would have them delivered by Tuesday.  Sergio MODESTO said that they needed at least half the money before he will give any product and that the price would be "five, five hundred at the most." Alejandro MARTINEZ responded that that was very expensive, and asked MODESTO if he could get the price down (¶ 148).

   (ii) On December 8, 2013, Alejandro MARTINEZ received an incoming call from Sergio MODESTO in which MODESTO said that he talked to his "uncle" who said that "he can't go any lower than five, five hundred" and that "he needs at least five so he can give it to his buddy and does not pressure too much" (¶ 148).

   (iii) Following this call, Alejandro MARTINEZ called CRI-2 and asked him if he would be interested in "that."  CRI-2 responded that he was, but that he would not have any "paper."  Alejandro MARTINEZ responded that he would just need a little bit of money, about "five."  Agents know that this conversation was about Alejandro providing CRI-2 with approximately 10 pounds of methamphetamine (¶¶ 149 - 150).

   (iv) On December 9, 2013, Alejandro MARTINEZ received an incoming call from Sergio MODESTO during which Sergio MODESTO told Alejandro MARTINEZ that "the shit already arrived" and that it was "in Modesto." MODESTO indicated that they needed to go pick it up.

   (v) During the evening of December 9, 2013, Alejandro MARTINEZ received an incoming call from Sergio MODESTO inquiring about when CRI-2 was going to arrive.  Alejandro MARTINEZ told Sergio MODESTO that "the dude is driving a trailer" and he did not know what time he would arrive.  Sergio MODESTO indicated that he was only able to get "six and a half" (¶¶ 165 - 166).

   (vi) On December 12, 2013, Alejandro MARTINEZ placed an outgoing call to MODESTO.  Alejandro told MODESTO about CRI-2's arrest in Rosemead, California and asked, "What did you do with that afterall?" Sergio MODESTO responded that he "gave it back to the guy, but it's there."  Alejandro MARTINEZ responded that maybe MODESTO could "talk to your uncle and hopefully he'll take it back."

294. **Antonio RAMIREZ (a.k.a. "Tonio"):**

    (a) On May 30, 2013, Alejandro MARTINEZ told CRI-2 that CRI-2's methamphetamine shipment had been delayed and would not arrive until the following day. Alejandro told CRI-2 that "Tonio" (later identified as Antonio RAMIREZ) could get CRI-2 20 - 30 pounds of methamphetamine, and currently had a kilogram of methamphetamine at his house set aside for CRI-2 (¶ 20).

    (b) After arriving at Antonio RAMIREZ's residence (TARGET PROPERTY 9), Antonio RAMIREZ explained to CRI-2 that he did not currently have a kilogram of methamphetamine available, but that he could get CRI-2 20-30 pounds of methamphetamine the following day for $6,000-$7,000 per pound. Antonio RAMIREZ then offered to sell CRI-2 two pounds of marijuana that he currently had in his possession. CRI-2 agreed and purchased approximately 862 grams of marijuana from Tonio (¶ 22).

    (c) On June 14, 2013, at approximately 2:24 pm, CRI-2 contacted Alejandro MARTINEZ and ordered a half pound of methamphetamine. Alejandro MARTINEZ explained that he could arrange the deal, and the two agreed to meet at the adjoining horse ranch properties located at TARGET PROPERTY 1 and TARGET PROPERTY 2 on June 19, 2013. Through pen register analysis, agents noted that at approximately 2:35 pm, Alejandro MARTINEZ called 209 262-5807, a telephone number associated with Antonio RAMIREZ (¶ 23).

    (d) On June 19, 2013, met with Alejandro MARTINEZ and purchased approximately 440 grams of methamphetamine from him for $7,000 (¶ 24).

295. **Gerardo BARRAZA:**

    (a) On August 14, 2013, CRI-2 purchased a Ruger Mini 30 rifle and a Norinco SKS assault style rifle from Gerardo BARRAZA for $2,200 (¶ 47).

    (b) Subscriber information for phone number 209-380-6754 indicates that it is subscribed to Gerardo BARRAZA at 2441 Clairibel Road in Riverbank, California (¶¶ 44 and 79).

    (c) On November 10, 2013, CRI-2 purchased approximately 1,000 grams of methamphetamine from Alejandro MARTINEZ for $10,000. Agents believe that Gerardo BARRAZA supplied the methamphetamine that Alejandro MARTINEZ sold to CRI-2. In the hours leading up to the controlled buy, there were 14 intercepted telephone calls between Alejandro MARTINEZ and telephone number 209- 380-6754 (the number subscribed to Gerardo BARRAZA) regarding the kilo of meth, additional methamphetamine for purchase, and the possibility the kilo of meth that was sold to the CRI-2 was

less than 1,000 grams. Of particular importance are the following intercepted calls and surveillance observations:

(i) On November 10, 2013, at approximately 1:55 pm, Alejandro MARTINEZ and Gerardo BARRAZA discussed meeting at about 4:00 pm. Alejandro MARTINEZ told BARRAZA, "The only thing is dude, if you go to the ranch, leave them in the refrigerator, dude, over there in the little room where I have the chairs." BARRAZA replied, "I'll call you when I'm over there." Agents believe that during this call Alejandro was instructing BARRAZA to leave the methamphetamine in a refrigerator located at the horse ranch properties. This belief is based, in part, on the dealings surrounding the July 25, 2013, controlled purchase of methamphetamine. During that event, CRI-2 observed Alejandro retrieve the methamphetamine from a refrigerator located in the barn at the horse ranch properties (¶ 82).

(ii) At approximately 6:53 pm, Gerardo BARRAZA called Alejandro MARTINEZ to discuss the weight of the methamphetamine previously provided to CRI-2. BARRAZA said, "Well dude, he is saying that it is the kilo . . . it was weighed by two people" (¶ 85).

(iii) At approximately 6:56 pm, Alejandro MARTINEZ contacted CRI-2 and asked him to re-weigh the kilo of methamphetamine to make sure the weight was correct. Alejandro MARTINEZ told CRI-2 that the source for the methamphetamine was claiming the weight was all good (¶ 85).

296. **Martin LOPEZ**:

(a) On November 26, 2013, through the coordinative efforts of Francisco FELIX, CRI-2 received approximately 23 pounds of methamphetamine from Martin LOPEZ (¶¶ 111 – 120).

(b) Between December 3, 2013, and December 9, 2013, Francisco FELIX directed CRI-2 to pay Martin LOPEZ $4,000 per pound for each of the 23 pounds of methamphetamine previously provided by LOPEZ ($92,000 total). Francisco FELIX also directed CRI-2 pick-up an additional 42 pounds of methamphetamine from Martin LOPEZ.

(c) After Francisco FELIX directed CRI-2 to meet with LOPEZ, CRI-2 contacted LOPEZ at 626-627-4001 and they made arrangements to meet at the same location they met on November 26, 2013, in Rosemead, California (¶¶ 161 – 162).

(d) After CRI-2 arrived at the predetermined meeting location, Martin LOPEZ handed CRI-2 three large wrapped boxes. Agents quickly moved in and detained Martin LOPEZ. After receiving consent from Martin LOPEZ, SA Davidson and SA Heredia discovered approximately 42 pounds of

methamphetamine inside the three boxes Martin LOPEZ had provided to CRI-2 (¶¶162 - 163).

(e) An additional 10 pounds of methamphetamine were located during a consent search of Martin LOPEZ's apartment (¶¶163 - 164).

## General Knowledge of Drug Traffickers

297.   I believe that the fruits, evidence and instrumentalities sought in this warrant and itemized in Attachment B, will corroborate the information set forth in this affidavit, further implicate the target individuals as a result of this investigation, and implicate other persons who could be arrested and charged with drug trafficking and related crimes.  Based upon my training and experience, and my conversations with experienced narcotics investigators involved in this investigation, I know that:

(a) Individuals involved in drug dealing often maintain at their residence, vehicles, and persons records and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing, storage, distribution, and transportation of drugs.  Even after the drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records are often maintained not only on paper, but also as computer data in the form of computer hardware and software.

(b) Individuals involved in drug dealing must often rely on others to obtain the drugs and to help them market the drugs. Evidence of the identities of these co-conspirators is often maintained at their residence, in their vehicles, and on their persons.

(c) Individuals involved in drug dealing earn sums of money and often try to legitimize these profits.  In order to do this, they attempt to secrete, transfer, and conceal the money by, (among other methods):  (a) placing assets in names other than their own name to avoid detection while maintaining control; (b) laundering the money through what appear to be a legitimate business or businesses; (c) hiding the money in their homes, safes, and safety deposit boxes; or (d) using the money to buy assets which are hard to trace by law enforcement.  Records of these transactions are often found at their residence, in their vehicles, stash locations and on their persons.

(d) Individuals involved in drug dealing often maintain large amounts of U.S. currency on hand in order to finance their ongoing drug business.  In addition, other assets generated by their drug business, or purchased with cash earned, such as vehicles, precious metals, and stones, and jewelry, are typically kept by drug dealers at their residence, in their vehicles, stash locations and on their persons to avoid detection by authorities.

(e) Individuals involved in drug dealing often maintain weapons, firearms, and ammunition on their person or at their residence and in their automobiles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs. Therefore, I am requesting authority to seize weapons, firearms, and ammunition that may be found at the places to be searched.

(f) Individuals involved in drug dealing often take, or cause to be taken, photographs of themselves, their associates, their property, and their drugs, and usually maintain these photographs in their possession.

(g) Premises used by individuals involved in drug dealing usually contain articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises.

(h) Individuals involved in drug dealing often conceal evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence.

(i) Individuals involved in drug dealing often conceal evidence of their drug dealing, firearms, by burying those items on the grounds surrounding their residence in order to prevent detection and seizure by officers conducting search warrants at the residence.

(j) Individuals involved in drug dealing often keep documents relating to drug transactions long after the transaction is completed. Thus, it is likely that such documents are still on the premises and that they will provide evidence of the events set forth in this Affidavit.

(k) Individuals involved in long-term drug dealing, specifically those who keep the same residence and telephone number over the long term, tend to continue their drug dealing without obvious changes in their operations in the same pattern and practice as in the past. Further, individuals who sell drugs for an extended period are likely to maintain fruits, instrumentalities, and records of drug sales at their residence.

(l) As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in cellular smart phones or computers. It is also my experience that these traffickers tend to keep these accounts and records in

their residence and in the areas under their control.  It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live.  United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).  It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.  United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).

(m) Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically traffickers keep records of those registrations and transactions in their residence.

(n) I have learned that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message.  Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones.  Mobile telephones also contain in their memory a telephone book.  This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business.  Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user.  The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate.  Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer.  Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity.  Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crimes.  Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

298.   In summary, based upon my training and experience and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in **Attachment B.**  Individuals involved in drug dealing often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in **Attachment B** to this Affidavit.

<u>Probable Cause Statement for Search Warrants</u>

299.   Based upon the information set forth above, there is probable cause to believe that evidence of a crime, contraband, fruits of a crime, and other illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically, violations of 21 U.S.C. § 841(a)(1) – Distribution of a Controlled Substance,  and 21 U.S.C. § 846 – Conspiracy; as fully described and incorporated in **Attachment B**, can be found in the following places described in **Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, A-9, A-10, A-11, A-12, A-13, A-14, A-15, A-16, A-17, and A-18**.  Your affiant respectfully requests that search warrants be issued for the locations further described in the incorporated **Attachments A (A-1 through A-18)**, so that any items further described in **Attachment B** may be seized pursuant to those search warrants.

(A-1)   1700 Almond Avenue, Patterson, California
(A-2)   1742 Almond Avenue, Patterson, California
(A-3)   541 Kristen Way, Mountain House, California
(A-4)   12737 Elm Avenue, Patterson, California
(A-5)   1602 Pomegranate Avenue, Patterson, California
(A-6)   818 Tuolumne Road, Ceres, California
(A-7)   2921 Georgia Court, Tracy, California
(A-8)   523 Hatheway Street, Tracy, California
(A-9)   1301 North Vincent Road, Turlock, California
(A-10)  1900 E. Grayson Road, Ceres, California
(A-11)  3941 Northern Oak Drive, Ceres, California
(A-12)  557 Traina Court, Patterson, California
(A-13)  2104 Manhattan Way, Modesto, CA
(A-14)  18910 6th Avenue Stevinson, California
(A-15)  2207 Orange Avenue, Patterson, California
(A-16)  1215 Golden Eye Court, Newman, California
(A-17)  27207 State Highway 33, Newman, California
(A-18)  1840 Fort Hall Place, Stockton, California

<u>Request to Seal</u>

300.   Because this affidavit and accompanying search warrants and arrest warrants reveal an on-going investigation, I request that they be sealed, except to the extent necessary to effectuate the purposes of the warrants (such as by law enforcement personnel), until further

order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others.

I declare under penalty and perjury the above information is true and correct based on my information and belief.

Philipp Maurer, Special Agent
Homeland Security Investigations

Sworn to and subscribed before
me this 27th day of January 2014

Honorable Kendall J. Newman
United States Magistrate Judge

Approved as to Form:

Michael D. McCoy
Assistant U.S. Attorney

65

## Attachment A-1

### 1700 Almond Avenue Patterson, California 95363

### APN: 048-015-013-000

The above location is a 19.63 acre property with a single story residence with a red tile roof. The residence is constructed with siding that is yellow in color, with a white front door. Almond Avenue runs southwest to northeast, and the property is located on the southern side of Almond Avenue. The property is surrounded by a metal fence with a swinging gate. A wood pillar on the street side of the metal fence has the numbers "1700" affixed to it. The property also has a large barn structure with several outbuildings and recreational vehicles on the property.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street View of 1700 Almond Avenue, Patterson, California 95363



Diagram of Approximate Property Lines

## Attachment A-2

### 1742 Almond Avenue Patterson, California 95363

### APN: 048-015-006-000

The above location is a 19.63 acre property with a single story residence with a red tile roof. The residence is constructed with stucco siding that is yellow in color, with stone siding on the street side of the residence. Almond Avenue runs southwest to northeast, and the property is located on the southern side of Almond Avenue. The property is surrounded by a stone and white metal fence with a swinging gate. The property also has a large barn structure with several outbuildings and recreational vehicles on the property, and a horse arena.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street View of 1742 Almond Avenue, Patterson, California 95363



Diagram of Approximate Property Lines

## Attachment A-3

### 541 Kristin Way, Mountain House, California 95391

#### APN 254-080-15

The above location is a two-story residence with a concrete tile roof. The residence is constructed with stucco and wood shingle siding that is gray in color. The garage door faces the street and is white in color. The residence is on the northwest corner of the intersection of Kenneth Street and Kristin Way. Kristin Way runs east to west, and the property is located on the northern side of Kristin Way. The residence has a white placard with the numbers "541" on it.

The search of the aforementioned location shall include:  ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found.  The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 541 Kristin Way, Mountain House, California 95391



Diagram of Approximate Property Lines

## Attachment A-4

### 12737 Elm Avenue Patterson, California

The above location is a 11.14 acre property with a two or three-story residence with a red tile roof. The residence is constructed with stucco siding that is yellow in color. The property is surrounded by a cinder block fence with a swinging gate. There are two garage doors that face the street and are white in color. Elm Avenue runs southeast to northwest, and the residence is on the west side of Elm Avenue.  There are multiple outbuildings, storage sheds, and recreational vehicles located on the property.

The search of the aforementioned location shall include:  ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found.  The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 12737 Elm Avenue, Patterson, California 95363



Diagram of approximate property lines

## Attachment A-5

### 1602 Pomegranate Avenue, Patterson, California 95363

### APN: 048-015-013-000

The above location is a 22.83 acre property with a single story residence with a brown roof. The residence is constructed with siding that is peach in color, with a front door and two white garage doors facing Pomegranate. Pomegranate Avenue runs southwest to northeast, and the property is located on the southern side of Pomegranate Avenue. The property is surrounded by a metal fence constructed with white poles with a swinging gate. The property also has a large barn structure with several outbuildings and recreational vehicles on the property.

The search of the aforementioned location shall include:  ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found.  The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street View of 1602 Pomegranate Avenue, Patterson, California 95363



Diagram of Approximate Property Lines

### Attachment A-6

### 818 W. Tuolumne Road, Ceres, California, California 95307

### APN: 022-030-002-000

The above location is a 9.84 acre property with a single story residence with a black roof. The residence is constructed with stucco siding that is peach in color with green trim. Tuolumne Road runs east to west, and the property is located on the southern side of Tuolumne Road. The property is surrounded by a metal cyclone fence with a three foot wrought iron fence in front of the house. The property also has a large barn structure with several outbuildings and barns on the property.

The search of the aforementioned location shall include:  ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found.  The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street View of 818 W. Tuolumne Road, Ceres, California, California 95307



Diagram of Approximate Property Lines

## Attachment A-7

### 2921 Georgia Court, Tracy, California 95376

### APN 214-190-03

The above location is a single story residence with a brown composite roof. The residence is constructed with stucco and wood shingle siding that is gray in color. The brown garage door faces the street and is bordered by brick pillars. The residence is on the west side of Georgia Court and the front door faces east. The residence has the numbers "2921" painted on the curb.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 2921 Georgia Court, Tracy, California 95376



Diagram of Approximate Property Lines

## Attachment A-8

### 523 Hatheway Street, Tracy, California 95391

### APN 254-070-18

The above location is a single story residence with a light gray tile roof. The residence is constructed with wood siding that is blue/gray in color. The white garage door faces the street and the house has white trim. The residence is in the southwest corner of a cul-de-sac and the front door faces north.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 523 Hatheway Street, Tracy, California 95391



Diagram of Approximate Property Lines

**Attachment A-9**

**1301 North Vincent Road, Turlock, California 95316**

**APN 024-040-004-000**

The above location is a 55.80 acre property with a single story residence with a brown composite shingle roof. The residence is constructed with siding that is tan in color with brown trim. Vincent Road runs northwest to southeast, and the property is located on the southwest corner of Vincent Road and Santa Fe Avenue. There is a silver mailbox on the street side in front of the residence that says "1301 Vincent." The property also has a carport facing Vincent with corrugated metal sides and roofing with teal trim and a teal door. There is a barn on the property as well located northwest of the main residence.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 1301 North Vincent Road, Turlock, California 95316



Diagram of Approximate Property Lines

## Attachment A-10

### 1900 E Grayson Road, Ceres, California 95307

### APN 041-032-030-000

The above location is a 3.74 acre property with a single family residence with light gray stucco exterior with white trim and a white steel security door. The front door faces Grayson Road and the front of the house has a tan six foot fence that is covered in stucco. On the west side of the house, there is a large air conditioning duct approximately 18"- 24" running along the outside of the roof line before reentering the attic area. To the east of the main residence, there is a large approximate 12' rolling wrought iron gate that leads to a parking area. The property has multiple outbuildings including garages, shed, and covered carports which are accessed through the rolling gate. There is a barn on the property as well located northwest of the main residence.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 1900 E Grayson Road, Ceres, California 95307



Diagram of Approximate Property Lines

## Attachment A-11

### 3941 Northern Oak Drive, Ceres, California 95307

### APN 069-036-014-000

The above location is a two story single family residence that has a light tan exterior with stone accents surrounding the main entry way. The residence has a brown tile roof with white gutters. The front door and garage door face south and the numbers "3941" are posted on the house to the right of the garage.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 3941 Northern Oak Drive, Ceres, California 95307



Diagram of Approximate Property Lines

**Attachment A-12**

**557 Traina Drive, Patterson, California 95363**

**APN 048-051-014-000**

The above location is a single story single family residence that has a light green exterior with a darker green trim. The residence has a gray composite shingle roof and the front door and garage door face east. The numbers "557" are posted on the house to the left of the garage.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 557 Traina Drive, Patterson, California 95363



Diagram of Approximate Property Lines

## Attachment A-13

### 2104 Manhattan Way, Modesto, California 95358

### APN 056-087-059-000

The above location is a two story single family residence with a tan stucco exterior with white trim. The residence has a gray roof and the front door and garage door face west. The wood front door is natural colored and the numbers "2104" are posted on the house to the right of the garage.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 2104 Manhattan Way, Modesto, California 95358



Diagram of Approximate Property Lines

**Attachment A-14**

**18910 Sixth Avenue, Stevinson, California**

**APN 055-238-054-000**

The above location is 10.48 acres with a single story residence with a gray roof. The residence is constructed with siding that is yellow in color. The roof of the residence overhangs on the south side. The property has a white metal fence with a swinging gate. Sixth Avenue runs east to west, and the residence is on the north side of Sixth Avenue. There are several outbuildings on the property including a hay barn.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Photo of 18910 Sixth Avenue, Stevinson, California



Diagram of approximate property lines

## Attachment A-15

### 2207 Orange Avenue, Patterson, California 95363

### APN 048-004-030-000

The above location is a 26.04 acre property with a single story residence with a red tile roof. The residence is white in color with a front door facing Orange Avenue. Orange Avenue runs southwest to northeast, and the property is located on the northern side of Orange Avenue. The property is surrounded by a tan stucco and white wrought iron fence with two rolling gates. One of the rolling gates has a red horse emblem affixed to the gate. The property also has a large barn structure with several outbuildings and recreational vehicles on the property.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 2207 Orange Avenue, Patterson, California 95363



Diagram of Approximate Property Lines

**Attachment A-16**

**1215 Golden Eye Court, Newman, California 95360**

**APN 049-048-018-000**

The above location is a two story single family residence that has a brown stucco exterior with brown trim located in a cul-de-sac. The residence has a brown tile roof, and the front door and garage door face west. The numbers "1215" are posted on the house to the right of the garage.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 1215 Golden Eye Court, Newman, California 95360



Diagram of Approximate Property Lines

**Attachment A-17**

**27207 Highway 33, Newman, California 95360**

**APN 026-039-010-000**

The above location is a 2.00 acre property with a single story residence with a grey composite shingle roof. The residence is gray in color with a front door facing Highway 33. Highway 33 runs northwest to southeast, and the property is located on the west side of Highway 33. The front of the house is obstructed from view from the street by bushes and a white mailbox affixed to two white wagon wheels with the numbers "27207" on it (in black lettering) – located along the street. The property has two approximate 3' rolling gates along the road and an outbuilding located southwest of the residence.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 27207 Highway 33, Newman, California 95360



Diagram of Approximate Property Lines

### Attachment A-18

### 1840 Fort Hall Place, Stockton, California 95206

### APN 163-650-30

The above location is a two story single family residence that has a red wood siding exterior with white trim and shutters. The residence has a composite shingle roof. The white front door and white garage door faces north, and the residence has a white metal security gate on the front door. The numbers "1840" are posted on the house above the garage.

The search of the aforementioned location shall include: ANY and ALL attachments, rooms, annexes, attics, basements, cellars, lofts, hidden rooms, garages, carports and other parts therein, the surrounding grounds/premises, storage sheds, barns, storage areas, trash containers, travel trailers, outbuildings, equipment sheds and any other location on the premises in which items in Attachment B may be found. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may also be found.



Street view of 1840 Fort Hall Place, Stockton, California 95206



Diagram of Approximate Property Lines

**Attachment B**
**Items to be Seized**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 (a)(1) and 846, Distribution of Controlled Substances and Conspiracy to Distribute Controlled Substances.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the offenses for which agents may search and seize includes:

1. Methamphetamine, or other drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2. Marijuana: marijuana product, plants, clone plants, used for sales/distribution and transportation thereof; including any items used to facilitate sales/distribution, tools and products used for the cultivation of marijuana; fertilizer, irrigation, hoses, drip lines, sprinkler systems, including electrical light systems, any equipment utilized to cultivate, clone marijuana plants. Items such as; scale(s), spoon(s) and other weighing and measuring devices. Packaging items/material and/or devices such as; plastic/Ziploc bag(s), paper bag(s), paper bindle(s), glass bottle(s), storage container(s), and vial(s).

3. United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

4. Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

5. Computers, computer components which operate computers, disks, computer printouts, computer codes, computer programs, computer screens, computer keyboards, directory disks, flash drives, thumb drives or any other computer file storage devise if located within the premise that would show the distribution of narcotics and the names or identities of persons included in such distributions, and/or which would reveal the receipt of proceeds from the distribution of controlled substances and the transfer, investment, control and disposition of those proceeds;

6. Digital cameras and digital camera storage cards;

7. Passwords, encryption keys, and other access devices that may be necessary to access the above devices or media, as well as written or printed material which

provides instructions or examples concerning the operation of the above devices, media, or software;

8. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

9. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute controlled substances;

10. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

11. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

12. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

13. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

14. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

15. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

16. Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

17. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

18. Cell phones located on the premises at the time of the search, and the information stored within to include:

    a.  Incoming call history;

    b.  Outgoing call history;

    c.  Missed call history;

    d.  Outgoing text messages;

    e.  Incoming text messages;

    f.  Draft text messages;

    g.  Telephone book;

    h.  Data screen or file identifying the telephone number associated with the mobile telephone searched;

    i.  Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched.

    j.  Stored media to include photographs and video.

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Gray in color Samsung cellular phone;<br>evidence number 69-18 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   **2: 1 7 - SW - 6 8 4   CKD**

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ EASTERN _____ District of _____ CALIFORNIA _____
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A-9

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 1, 2017 _____
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Hon. Carolyn K. Delaney or duty magistrate judge        .
                *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
                                ☐until, the facts justifying, the later specific date of _____ .

Date and time issued:  7/25/2017
                                4:16 pm

City and state:   Sacramento, California                Hon. Carolyn K. Delaney, U.S. Magistrate Judge
                                                *Printed name and title*

*Judge's signature*

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|

| **Certification** |
|---|

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant
to the designated judge.


Date: _____

_____
                                                                *Executing officer's signature*

_____
                                                                *Printed name and title*

Subscribed, sworn to, and returned before me this date.   _____   _____
                                                                *Signature of Judge*                                  *Date*

# ATTACHMENT A-9

*Items to be Searched*

Gray in color Samsung cellular phone labeled with the following numbers: Model: SGH-T599N
UD, FCC ID: A3LSGHT599, and contained within an evidence envelope labeled 69-18.
DEVICE 9 is currently located at the Homeland Security Investigations (HSI) Sacramento office,
located at 650 Capitol Mall, Suite 3-100, Sacramento, CA 95814 and has been in the continuous
custody of law enforcement since January 29, 2014.

This warrant authorizes the forensic examination of the devices for the purpose of identifying the
electronically stored information described in Attachment B.

# ATTACHMENT B
*Items to be Seized*

This search warrant grants authority to seize all of the items set forth below:

1. Any and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with the mobile telephones, including:

    a. Incoming call history;

    b. Outgoing call history;

    c. Missed call history;

    d. Outgoing text messages;

    e. Incoming text messages;

    f. Draft text messages;

    g. Telephone book;

    h. Data screen or file identifying the telephone number associated with the mobile telephone searched;

    i. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

    j. Voicemail;

    k. User-entered messages (such as to-do lists); and

    l. Stored media such as photographs or video.

2. Any passwords used to access the electronic data described above.

3. Any and all locations, addresses, GPS coordinates, names, time/date information, or other electronic data related to addresses and driving directions.

4. All information and records related to drug trafficking, including:

    a. Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators;

    b. lists of customers and related identifying information;

    c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

14

     d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

     e.  any information recording schedule or travel;

     f.  all bank records, checks, credit card bills, account information, and other financial records.

     g.  records of Internet Protocol addresses used;

     h.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

5. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.